David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
dbower@monteverdelaw.com

*Counsel for Plaintiff Steven Germano*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| STEVEN GERMANO, On Behalf of Himself And All Others Similarly Situated, <br><br>Plaintiff, <br><br>v. <br><br>AIMMUNE THERAPEUTICS, INC., JAYSON D.A. DALLAS, MARK T. IWICKI, GREG BEHAR, BRETT K. HAUMANN, MARK D. MCDADE, STACEY D. SELTZER, PATRICK G. ENRIGHT, and KATHRYN E. FALBERG, <br><br>Defendants. | Civil Action No.  3:20-cv-06733 <br><br>**CLASS ACTION COMPLAINT** <br><br>**DEMAND FOR JURY TRIAL** <br><br>1. **Violation of Securities Exchange Act §14(e)** <br>2. **Violation of Securities Exchange Act §20(a)** <br>3. **Breach of Fiduciary Duty** |

Plaintiff Steven Germano ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is a stockholder class action brought by Plaintiff and all other similarly situated public stockholders of Aimmune Therapeutics, Inc. ("Aimmune" or the "Company") and its board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Aimmune, the "Defendants"), arising out of Defendants' attempt to sell the Company to its

1
**CLASS ACTION COMPLAINT**

1. largest shareholder in violation of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78n(e) and 78t(a) respectively, as well as for breaching their fiduciary duties under Delaware law.

2. On August 29, 2020, Aimmune entered into an agreement and plan of merger with Société des Produits Nestlé S.A. ("Nestlé") and its subsidiary SPN MergerSub, Inc. ("Merger Sub") (the "Merger Agreement"), pursuant to which Merger Sub will offer to purchase all of the issued and outstanding common stock of the Company at a purchase of $34.50 per share ("Offer Price"). Should the minimum condition be met by a sufficient number of shareholders tendering in favor of the offer, Merger Sub will merge with and into the Company, with the Company surviving the merger as a wholly owned subsidiary of Nestlé (the "Tender Offer" or "merger").

3. On September 14, 2020, in order to convince Aimmune's public common stockholders to tender their shares, the Defendants issued a Schedule 14D-9 Recommendation Statement ("Recommendation Statement") with the SEC, that omit material information necessary for stockholders to make an informed decision whether to tender their shares.

4. The Tender Offer is initially set to expire at 12:00 midnight., Eastern Time, on October 9, 2020 (the "Expiration Time"). It is imperative that the material information which has been omitted from the Recommendation Statement is disclosed to the Company's stockholders prior to the Expiration Time so they can make a fully informed decision. Therefore, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Tender Offer unless and until the material information discussed below is disclosed to Aimmune's stockholders sufficiently in advance of the Expiration Time or, in the event the Tender Offer is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act and from breaching their fiduciary duties.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(e), and 20(a) of the Exchange Act. This Court also has jurisdiction over the state law claim for breaches of fiduciary duty pursuant to 28 U.S.C. § 1367.

6. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

7. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391 because: (i) the conduct at issue took place and had an effect in this District; (ii) Aimmune maintains its principal executive offices in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; (iv) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Aimmune common stock.

9. Defendant Aimmune is a public company incorporated under the laws of Delaware with principal executive offices located at 8000 Marina Blvd, Suite 300, Brisbane, CA 94005. Aimmune's common stock is traded on the Nasdaq under the ticker symbol "AIMT."

10. Defendant Jayson D.A. Dallas is, and has been at all relevant times, a member of the Board.

11. Defendant Stacey D. Seltzer is, and has been at all relevant times, a member of the Board.

12. Defendant Mark T. Iwicki is, and has been at all relevant times, a member of the Board.

13. Defendant Greg Behar is, and has been at all relevant times, a member of the Board.

14. Defendant Brett K. Haumann is, and has been at all relevant times, a member of the Board.

15. Defendant Mark D. McDade is, and has been at all relevant times, a member of the Board.

16. Defendant Patrick G. Enright is, and has been at all relevant times, a member of the Board.

17. Defendant Kathryn E. Falberg is, and has been at all relevant times, a member of the Board.

18. The Defendants identified in paragraphs 10 through 17 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Aimmune, the "Defendants."

## CLASS ACTION ALLEGATIONS

19. Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Aimmune (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

20. This action is properly maintainable as a class action because:

21. The Class is so numerous that joinder of all members is impracticable. As of September 10, 2020, there were 65,766,796 shares of Aimmune common stock outstanding, held by tens of thousands of individuals and entities scattered throughout the country. The actual number of public stockholders of Aimmune will be ascertained through discovery;

22. There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

23. whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Recommendation Statement, in violation of Sections 14(e) of the Exchange Act;

24. whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

25. whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to tender their shares based on the materially incomplete and misleading Recommendation Statement;

26. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

27. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

28. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

29. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

30. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**SUBSTANTIVE ALLEGATIONS**

**A.   Background of the Company and the Tender Offer**

31. Aimmune is a commercial-stage biopharmaceutical company developing a line of drugs designed to desensitize patients with common food allergies.

32. Nestlé is a nutrition, health and wellness company, best known for its food brands.

33. According to the August 31, 2020, press release announcing the Tender Offer:

5

**Aimmune Agrees to be Acquired by Nestlé Healthy Science**

SAN DIEGO BRISBANE, Calif.--(BUSINESS WIRE)--Aug. 31, 2020--Aimmune Therapeutics Inc. (Nasdaq: AIMT), a biopharmaceutical company developing and commercializing treatments for potentially life-threatening food allergies, today announced that it has entered into a definitive agreement for Sociétés des Produits Nestlé, S.A. to acquire Aimmune for $34.50 per share in an all-cash transaction, implying a fully-diluted equity value of $2.6 billion. Sociétés des Produits Nestlé, S.A. is a part of Nestlé Health Science (NHSc) and a wholly owned subsidiary of Nestlé S.A. The agreement was unanimously approved by all of the independent members of the Board of Directors of Aimmune. Greg Behar, CEO of Nestlé Health Sciences and an Aimmune Director, abstained due to his position with Nestlé Health Science.

"The agreement with Nestlé recognizes the value created by years of commitment and dedication to our mission by the team at Aimmune. Delivering PALFORZIA, the world's first treatment for food allergy, is a game-changing proposition in the biopharmaceutical industry and is transformative for the lives of millions of people living with potentially life-threatening peanut allergy," said Jayson Dallas, MD, President and Chief Executive Officer of Aimmune. "This acquisition provides strong value for our shareholders and ensures a level of support for PALFORZIA and our pipeline that will further enhance their potential for patients around the world living with food allergies. Aimmune appreciates the continued strong collaboration with Nestlé Health Science dating back to 2016 through their support as a shareholder and board member, as well as through their consumer/nutrition strength and experience. Their extensive capabilities and global reach, as well as their alignment with our vision of pioneering treatments and solutions for food allergies, are a strong fit for our company."

"This transaction brings together Nestlé's nutritional science leadership with one of the most innovative companies in food allergy treatment," said Nestlé Health Science CEO Greg Behar. "Together, we will be able to create a world leader in food allergy prevention and treatment and offer a wide range of solutions that can transform the lives of people around the world living with food allergies."

The transaction is expected to close in the fourth quarter of 2020, pending the satisfaction of all conditions to the completion of the tender offer. Until that time, Aimmune will continue to operate as a separate and independent company.

Aimmune's financial advisors are J.P. Morgan Securities LLC and Lazard. Latham & Watkins LLP is acting as legal counsel for Aimmune.

**Transaction Details**

Under the terms of the merger agreement, Nestlé S.A.'s wholly-owned subsidiary, Société des Produits Nestlé S.A. (SPN), will commence a cash tender offer to acquire all outstanding shares of Aimmune common stock that are not already owned by NHSc for $34.50 per share in cash, and Aimmune agreed to file a recommendation statement containing the unanimous recommendation of the independent members of the Aimmune board that Aimmune stockholders tender their shares to SPN. Following the completion of the tender offer, Nestlé expects to promptly consummate a merger of Aimmune with a subsidiary of SPN, in which shares of Aimmune that have not been tendered in the tender offer will be acquired by SPN and converted into the right to receive the same cash price per share as paid in the tender offer.

The closing of the tender offer is subject to customary closing conditions, including the tender of a majority of outstanding Aimmune shares on a fully diluted basis which shall include the shares of Aimmune common stock currently held by Nestlé and its affiliates and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act and antitrust approvals in Germany. The merger agreement includes customary termination provisions for both Aimmune and Nestlé.

34. The Tender Offer comes in the midst of the COVID-19 pandemic ("Pandemic"), at a time when stocks throughout the world are subject to great uncertainty and radical change. Prior to the Pandemic, the Company was trading as high as $37.00 per share. The Offer Price constitutes a 6.76% discount per share to its pre-COVID-19 trading price. The Offer Price does not compensate stockholders for the intrinsic value of their shares and instead provides a substantial discount to Nestlé, the Company's largest shareholder.

35. And so, piggybacking off the Pandemic and the Company's depressed stock price, the Tender Offer will provide a substantial discount to Nestlé, at the expense of the common stockholders who will not see the intrinsic value of their shares realized nor be able to partake in the continued growth of the Company. Therefore, it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Recommendation Statement, which is necessary for stockholders to properly determine whether to tender their shares.

**B.     The Recommendation Statement Omits Material Information**

36. On September 14, 2020, Defendants filed a materially incomplete and misleading Recommendation Statement with the SEC. The Individual Defendants were obligated to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Recommendation Statement omits material information that is necessary for the Company's stockholders to decide whether to tender their shares.

37. *First*, the Recommendation Statement contains materially false or misleading statements and omits certain material information concerning the Company's projected financial information.

38. In evaluating a sale of the Company, management prepared projections to evaluate Aimmune as a standalone Company, which were relied upon by J.P. Morgan Securities LLC ("J.P. Morgan") and Lazard Frères & Co. LLC ("Lazard" and together with J.P. Morgan, the "Financial Advisors") for purposes of their fairness opinion and by the Aimmune Board in connection with its consideration of the Proposed Transaction. The recommendation statement discloses: (i) Management Projections, and (ii) Early Long-Term Projections, further broken down into Most and Least Favorable Early Long-Term Projections. The Early Long-Term Projections were presented to the Board on August 4, 2020, and the Management Projections were presented to the Board a few weeks later on August 27, 2020, the day before the vote to approve the Merger Agreement.

39. Considering that the Board and bidders had access to the Early Long-Term Projection and relied on them at all times throughout the merger process, it is critical that shareholders receive this material information as it would certainly alter the total mix of information available. For the reasons provided, pertaining to the Early Long-Term Projections the Company must disclose: (i) the unlevered free cash flow projections; (ii) the various inputs and assumptions underlying each set of projections; (iii) the middle-of-the-road projections for the same metrics disclosed in the Recommendation Statement; and (iv) all bases for deciding to use the Management Projections for the Company's valuation.

40. Pertaining to the Management Projections, the Recommendation Statement fails to disclose: (i) information concerning the "probability-adjust[ments]", specifically what the adjustments were adjusted from and the "probabilities" that went into this determination; and (ii) Net Income projections. The Recommendation Statement provides the Management Projections and states that they were "probability-adjusted" without explaining what that means or providing the projection sets they were adjusted from. Furthermore, as to the adjustments themselves, the Recommendation Statement only provides boilerplate, vague language without saying much: "assumptions included the risks and probability of success of the Company's product candidates, timing for clinical trial completion and commercial launch, along with estimated operational costs, including sales & marketing, research & development, manufacturing, and general &

administrative, and other market and financial conditions and other future events." Rec. Stmt. 46. According to that definition, the adjustments could be almost anything, stockholders are entitled to more information to understand how the value of their shares was calculated.

41. The Recommendation Statement also omits the net income projections for the Management Projections. This must be disclosed for two reasons. First, net income projections are provided for the Early Long-Term Projections and so is necessary for comparison purposes. Second, net income projections are the most comparable GAAP metric, and so must be disclosed for shareholders to be able to rely on the information. Simply put, net income projections are irreplaceable when it comes to fully, fairly, and accurately understanding a company's projections and value

42. ***Second***, the Recommendation Statement omits material information regarding the financial analyses conducted by J.P. Morgan and Lazard.

43. With respect to J.P. Morgan's *Public Trading Multiples Analysis*, the Recommendation Statement *must* disclose: (i) the equity value for each company observed; (ii) the estimated net debt or net cash for each company observed; (iii) J.P. Morgan's assumptions for selecting each of the companies observed; (iv) all line-items used in the analysis for each company observed; and (v) the assumptions for the selecting a FV/2024E Revenue Multiple reference range for the Company of 0.8x to 3.4x.

44. With respect to J.P. Morgan's *Selected Transaction Analysis,* the Recommendation Statement fails to disclose: (i) the target company's FV implied in the relevant transaction; (ii) the target company's estimated probabilities of success; and (iii) J.P. Morgan's basis for selecting each of the transactions observed.

45. With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Recommendation Statement is materially misleading and incomplete because it fails to disclose (i) the unlevered free cash flow inputs through 2035; (ii) J.P. Morgan's basis for applying perpetual growth rates ranging from negative 40% to negative 20%; (iii) the estimated terminal value; (iv) J.P. Morgan's basis for selecting discount rates ranging from 10.0% to 14.0%; and (v) the reasons for assuming a future equity raise of $125 million in gross proceeds in 2021.

46. Similarly with respect to Lazard's *Discounted Cash Flow Analysis*, the Recommendation Statement is materially misleading and incomplete because it fails to disclose (i) the unlevered free cash flow inputs through 2035; (ii) Lazard's basis for applying perpetual growth rates ranging from negative 40% to negative 20%; (iii) the estimated terminal values; (iv) Lazard's basis for selecting discount rates ranging from 10.0% to 12.0%; (v) the range of enterprise values; and (vi) the reasons for assuming a future equity raise of $125 million.

47. With respect to Lazard's *Selected Public Companies Analysis*, the Recommendation Statement *must* disclose: (i) Lazard's assumptions for selecting each of the companies observed; and (ii) all line-items used in the analysis for each company observed.

48. With respect to Lazard's *Selected Precedent Transactions Analysis,* the Recommendation Statement fails to disclose: (i) the multiples of the target company's three-year forward revenues for each transaction; (ii) the range of Upfront/FY+3 Revenue multiples for the selected precedent transactions; and (iii) Lazard's basis for selecting each of the transactions observed.

49. With respect to Lazard's *Premium Paid Analysis,* the Recommendation Statement fails to disclose; (i) the identity of each transaction observed; and (ii) the premiums paid for each transaction.

50. As one highly respected law professor explained regarding these crucial inputs, in a financial analysis for a fairness opinion a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices*. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further*

> dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Therefore, shareholders need this information to make a meaningful determination whether the implied equity value reflects the value of Aimmune or else was the result of an unreasonable judgment by J.P. Morgan and Lazard.

51. ***Third***, the Recommendation omits material information concerning the compensation to be received by the Financial Advisors. For J.P. Morgan, the Recommendation Statement provides the compensation which Nestlé's affiliates paid to J.P. Morgan but fails to identify whether J.P. Morgan received any compensation in the last two years directly from Nestlé. For Lazard, the Recommendation Statement ***fails to provide any of the compensation Lazard received from L'Oreal S.A. and its subsidiaries, a Nestlé affiliate, during the past two years***. This information is of the utmost importance to stockholders.

52. Disclosure of "any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to Item 1015. 17 CFR § 229.1015(b)(4). Indeed, it is imperative for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed merger must be carefully considered in assessing how much credence to give its analysis. A reasonable shareholder would want to know what important economic motivations that the advisor, employed by a board to assess the fairness of the merger to the shareholders, might have.

53. ***Fourth and finally***, the Recommendation Statement states that the Company was entering strategic combination discussions with other parties, and that 5 parties were seriously considered. *See* Rec. Stmt. at 19-22. Yet, the Recommendation Statement fails to plainly disclose whether the bidders were subject to standstill agreements and whether they contained DADW provisions. The failure to plainly disclose the existence of DADW provisions and confidentiality agreements creates the false impression that any company could have made a superior proposal. If there are confidentiality agreements containing DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Any reasonable

stockholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.

54. In sum, the omission of the above-referenced information renders the Recommendation Statement materially incomplete and misleading, in contravention of the Exchange Act and state law. Absent disclosure of this material information prior to the Expiration Time, Plaintiff will be unable to make an informed decision regarding whether to tender his shares, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**Claims Against All Defendants for Violations of Section 14(e) of the Exchange Act**

55. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

56. Defendants caused the Recommendation Statement to be issued with the intention of soliciting shareholder support of the Proposed Transaction.

57. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

58. Defendants violated this clause of Section 14(e) because they negligently caused or allowed the Recommendation Statement to be disseminated to Aimmune shareholders in order to solicit them to tender their shares in the Tender Offer, and the Recommendation Statement contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

59. Defendants negligently omitted the material information identified above from the Recommendation Statement or negligently failed to notice that such material information had been omitted from the Recommendation Statement, which caused certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access

to and/or reviewed the omitted material information in connection with approving the Tender Offer, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading. As directors and officers of Aimmune, the Individual Defendants had a duty to carefully review the Recommendation Statement before it was disseminated to the Company's shareholders to ensure that it did not contain untrue statements of material fact and did not omit material facts. The Individual Defendants were negligent in carrying out their duty.

60. Aimmune is imputed with the negligence of the Individual Defendants, who are each directors and/or senior officers of Aimmune.

61. As a direct result of Defendants' negligent preparation, review, and dissemination of the false and/or misleading Recommendation Statement, Plaintiff and other Aimmune shareholders are impeded from making a decision on a fully informed basis and are induced to tender their shares and accept the inadequate Merger Consideration in connection with the Proposed Transaction. The false and/or misleading Recommendation Statement used to solicit the tendering of shares impedes Plaintiff and other Aimmune shareholders from making a fully informed decision regarding the Tender Offer and is an essential link in consummating the Proposed Transaction, which will deprive them of full and fair value for their Aimmune shares. At all times relevant to the dissemination of the materially false and/or misleading Recommendation Statement, Defendants were aware of and/or had access to the true facts concerning the process involved in selling Aimmune, the projections for Aimmune, and Aimmune's true value, which is greater than the Merger Consideration Aimmune's shareholders will receive.

62. The misrepresentations and omissions in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares in the Tender Offer. In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Recommendation Statement and in other information reasonably available to shareholders. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's

equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

63. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

64. The Individual Defendants acted as controlling persons of Aimmune within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Aimmune and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Recommendation Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contend are false and/or misleading.

65. Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

66. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Recommendation Statement contains the unanimous recommendation of the Individual Defendants to approve the Tender Offer. They were thus directly involved in the making of the Recommendation Statement.

67. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

68. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(e) of the Exchange Act, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. Plaintiff and

the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

**Against the Individual Defendants for Breach of Their Fiduciary Duty of Candor/Disclosure**

69. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

70. By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Recommendation Statement did not omit any material information or contain any materially misleading statements.

71. As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving or causing the materially deficient Recommendation Statement to be disseminated to Plaintiff and the Company's other public shareholders.

72. The misrepresentations and omissions in the Recommendation Statement are material, and Plaintiff will be deprived of his right to make an informed decision on whether to tender his shares if such misrepresentations and omissions are not corrected prior to the Expiration Date. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to fully informed corporate suffrage—the harm suffered is an individual and irreparable harm.

73. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands relief in his favor and against the Defendants jointly and severally, as follows:

  A. Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

  B. Preliminarily enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, until Defendants disclose the material information identified above that has been omitted from the Recommendation Statement;

  C. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

  D. Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

  E. Awarding Plaintiff an the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

  F. Granting such other and further equitable relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: September 25, 2020    Respectfully submitted,

**OF COUNSEL**    */s/ David E. Bower*
    David E. Bower

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde    David E. Bower SBN 119546
The Empire State Building    **MONTEVERDE & ASSOCIATES PC**
350 Fifth Avenue, Suite 4405    600 Corporate Pointe, Suite 1170
New York, New York 10118    Culver City, CA 90230
Tel: 212-971-1341    Tel: (213) 446-6652
Fax: 212-202-7880    Fax: (212) 202-7880
jmonteverde@monteverdelaw.com    dbower@monteverdelaw.com

    *Counsel for Plaintiff*

*Counsel for Plaintiff*