David E. Bower (SBN 119546)
MONTEVERDE & ASSOCIATES PC
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
dbower@monteverdelaw.com

*Counsel for Co-Lead Plaintiffs*

[*Additional Counsel on Signature Page*]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE AIMMUNE THERAPEUTICS, INC. SECURITIES LITIGATION | Master File No. 3:20-CV-06733 |
|  | AMENDED COMPLAINT |
|  | CLASS ACTION |
|  | DEMAND FOR JURY TRIAL |
|  | 1.  VIOLATIONS OF SECTION 14(e) OF THE SECURITIES EXCHANGE ACT OF 1934 |
|  | 2.  VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 |

Co-Lead Plaintiffs Bruce and Barbara Carol Svitak and Cecilia Pemberton ("Plaintiffs"), by their undersigned attorneys, allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This is a stockholder class action brought by Plaintiffs and all other similarly situated former public stockholders of Aimmune Therapeutics, Inc. ("Aimmune" or the "Company") against

- 1 -

Aimmune and the Company's former President, Chief Executive Officer, and director, Jayson D.A. Dallas ("Dallas" and together with Aimmune, "Defendants"), arising out of Defendants' sale of the Company to its largest shareholder, Société des Produits Nestlé S.A. ("Nestlé"), at a price far below its fair value in violation of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78n(e) and 78t(a).

2.      On August 29, 2020, Aimmune entered into an agreement and plan of merger (the "Merger Agreement") with Nestlé and its subsidiary, SPN MergerSub, Inc. ("Merger Sub"), pursuant to which Merger Sub commenced a tender offer to purchase all the issued and outstanding common stock of the Company at $34.50 per share ("Offer Price"). The Offer Price represented a substantial discount for Nestlé at the expense of Aimmune's stockholders. To make matters worse, Nestlé's wellness division is well known for scandals regarding unethical business practices and so the transaction endangers the utility of a potentially life-saving drug.[1]

3.      On September 14, 2020, to convince Aimmune's public common stockholders to tender their shares, the Defendants issued a Schedule 14D-9 Recommendation Statement ("Recommendation Statement") with the SEC that omitted and misstated material information necessary for stockholders to make an informed decision on whether to tender their shares. As described below, the Recommendation Statement contained fabricated projections that misled stockholders as to the value of their shares. The Recommendation Statement also omitted material information concerning market research that contradicted Defendants' justifications for lowering the

---

[1]      Critics accuse Nestlé of taking clean drinking water in areas that sorely need it, being complicit in human trafficking and child labor, and exploiting uneducated mothers in third world countries *See* Arthur Neslen, *Nestlé under fire for marketing claims on baby milk formulas*, THE GUARDIAN (Feb. 1, 2018), https://www.theguardian.com/business/2018/feb/01/Nestlé-under-fire-for-marketing-claims-on-baby-milk-formulas (last visited Feb 5, 2021); *see also Nestlé, embroiled in child labour and water scandals doesn't want to 'marginalise' anyone*, THE BIG SMOKE (Nov. 16, 2020), https://www.thebigsmoke.com.au/2020/11/16/Nestlé-embroiled-in-child-labour-and-water-scandals-doesnt-want-to-marginalise-anyone/ (last visited Feb 5, 2021); *see also* Clark Wolf, *Has Nestlé Gone Too Far?*, FORBES (Aug. 20, 2015), https://www.forbes.com/sites/clarkwolf/2015/08/20/has-Nestlé-gone-too-far/?sh=6e66fee9146c (last visited Feb 5, 2021).

projections from earlier estimates, and contained misleading statements regarding the bankers' valuation analyses and the purported fairness of the Offer Price.

4.    On October 8, 2020, as a direct result of Defendants' violations of U.S. federal securities laws, a sufficient number of shareholders tendered in favor of the offer, and, as a result, Merger Sub merged with and into the Company, with the Company surviving the merger as a wholly owned subsidiary of Nestlé (the "Merger" or "Tender Offer").

5.    The Tender Offer came a few months after the announcement on January 31, 2020, that the Company's flagship drug, Palforzia, was approved by the FDA for use in the treatment of peanut allergies. However, the launch of Palforzia was temporarily hampered by the spread of the COVID-19 coronavirus ("Pandemic"). In the months following FDA approval, and in the midst of the Pandemic, the Company conducted in-depth quantitative and qualitative market research to evaluate the Pandemic's impact on future revenues for Palforzia. The results revealed that the "COVID-19 pandemic has had little or no impacts on caregivers' willingness to stop their children on Palforzia," and management stated as recently as July 31, 2020, that the results "reinforced [Aimmune's] expectation for the long-term" success of Palforzia. *See* Earnings Call, Q1 2020; Earnings Call, Q2 2020.

6.    Throughout the process of the merger, including up to two days before the approval of the August 29, 2020 Merger Agreement, the Company's Board of Directors (the "Board") was presented with projections referred to in the Recommendation Statement as the Early Long-Term Projections (the "Long-Term Projections") that were prepared by the Company's management, including Defendant Dallas. The Long-Term Projections *already* reflected the "significant uncertainty surrounding the impact of COVID-19 on [the Company's flagship drug, Palforzia] and the uncertainties inherent in the Company's pipeline," and were further broken down into a Most Favorable Scenario, a Middle-of-the-Road Scenario, and a Least Favorable Scenario. Rec Stmt. 46. Only the Most Favorable Scenario was presented to Nestlé. The Least Favorable Scenario was not presented to counterparties; it considered the impact of a 50% reduction in revenue across all of the

1  Company's programs and was created during the most uncertain time of the Pandemic (the Spring

2  and Summer of 2020). Market research conducted by Aimmune and insider statements confirmed

3  that the Least Favorable Scenario was highly unlikely.

4          7.      Yet, just two days prior to signing the Merger Agreement and ***the day before the***

5  ***issuance of the fairness opinions***, the Board approved a new set of projections that were prepared by

6  the Company's management, including Defendant Dallas, which were called the "Company

7  Management Projections" in the Recommendation Statement (and are hereinafter referred to as the

8  "the "Fairness Opinion Projections"), which most closely resembled the Least Favorable Scenario,

9  which had provided for a blanket 50% reduction in revenue across all of the Company's programs.

10  As can be seen in the below numerical chart and illustrative graph, this had an enormous impact on

11  the financial forecast for the Company:

| Aimmune Revenue Projections (In Millions of Dollars) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Projection Scenarios** | | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** |
| **Most Favorable** | **Early Long-Term Projections** | 8.00 | 212.00 | 517.00 | 857.00 | 1,219.00 | 1,682.00 | 2,120.00 | 2,446.00 | 2,797.00 | 3,661.00 | 4,620.00 |
| | **Fairness Opinion Projections** | 12.00 | 81.00 | 291.00 | 514.00 | 712.00 | 930.00 | 1,170.00 | 1,333.00 | 1,445.00 | 1,551.00 | 1,730.00 |
| | *Percent Change* | 50% | -61.79% | -43.71% | -40.02% | -41.59% | -44.71% | -44.81% | -45.50% | -48.34% | -57.63% | -62.55% |
| **Least Favorable** | **Early Long-Term Projections** | 4.00 | 106.00 | 258.00 | 429.00 | 609.00 | 841.00 | 1,060.00 | 1,223.00 | 1,390.00 | 1,828.00 | 2,262.00 |
| | **Fairness Opinion Projections** | 12.00 | 81.00 | 291.00 | 514.00 | 712.00 | 930.00 | 1,170.00 | 1,333.00 | 1,445.00 | 1,551.00 | 1,730.00 |
| | *Percent Change* | 200% | -23.58% | 12.79% | 19.81% | 16.91% | 10.58% | 10.38% | 8.99% | 3.96% | -15.15% | -23.52% |
| **Average of Most and Least Favorable** | **Early Long-Term Projections** | 6.00 | 159.00 | 387.50 | 643.00 | 914.00 | 1,261.50 | 1,590.00 | 1,834.50 | 2,093.50 | 2,744.50 | 3,441.00 |
| | **Fairness Opinion Projections** | 12.00 | 81.00 | 291.00 | 514.00 | 712.00 | 930.00 | 1,170.00 | 1,333.00 | 1,445.00 | 1,551.00 | 1,730.00 |
| | *Percent Change* | 100% | -49.06% | -24.90% | -20.06% | -22.10% | -26.28% | -26.42% | -27.34% | -30.98% | -43.49% | -49.72% |



- 4 -

8.      Despite these projections never having been provided to Nestlé (or any other bidders), nor these projections reflecting the in-depth market research performed by the Company, the **substantially lower** Fairness Opinion Projections were used by J.P. Morgan Securities LLC ("J.P. Morgan") and Lazard Frères & Co. LLC ("Lazard" and together with J.P. Morgan the "Financial Advisors") to calculate their respective fairness opinions.

9.      In short, the Fairness Opinion Projections were illegitimate and did not reflect the expected future financial performance of Aimmune. Defendant Dallas and Aimmune management knew the Company's anticipated financial performance was much higher, but nevertheless prepared the Fairness Opinion Projections so that the Company's Financial Advisors had projections they could utilize to justify their fairness opinions, **which were rendered just one day** after the Fairness Opinion Projections were approved. Accordingly, the Recommendation Statement misled Aimmune's stockholders with respect to the purported fairness of the Offer Price, the value of their shares, and the legitimacy of the Fairness Opinion Projections.

10.    These facts resulted in the Recommendation Statement containing the following materially false and/or misleading statements:

- <u>First</u>, the Fairness Opinion Projections *themselves* on pages 45-46 of the Recommendation Statement were materially false and misleading, and *did not* reflect managements' "best currently available estimates and judgments…as to the expected future results of operations and financial condition of the Company" as stated on page 33 of the Recommendation Statement. Instead, Defendant Dallas unreasonably approved the significantly lower Fairness Opinion Projections for use by the Financial Advisors in their fairness opinions, just one day before they were rendered. The Fairness Opinion Projections do not reflect the results of the Company's market research, which management – including Defendant Dallas – found reinforced their "expectation for the long-term potential" of their flagship drug. Rather, the Fairness

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

1    Opinion Projections reflected the worst-case scenario of projections, which were never

2    even provided to the buyer – Nestlé.

3    •    Second, the summaries of the valuation analyses performed by the Financial Advisors

4         in conjunction with their fairness opinions on pages 32-44 of the Recommendation

5         Statement and the resulting implied per share value ranges were false and/or materially

6         misleading. Defendant Dallas knew that those valuation analyses and value per share

7         ranges were inaccurate and did not reflect the implied value of the Company's shares

8         and the fairness of the Offer Price. Indeed, Defendant Dallas knew that the Financial

9         Advisors relied solely upon the illegitimate Fairness Opinion Projections that he

10        prepared to allow them to conduct their valuations—with the Financial Advisors'

11        assuming that the Fairness Opinion Projections reflected managements' "best

12        estimates" and that they were "reasonably prepared." The law did not require

13        Defendants to obtain fairness opinions, and it certainly did not require them to obtain

14        opinions based upon the concocted Fairness Opinion Projections that did not reflect

15        Aimmune's actual future financial prospects. Rather, Defendants secured "fairness"

16        opinions to help convince shareholders to tender their shares. But, in so doing, Section

17        14(e) of the Exchange Act prohibited them from including valuation analyses

18        summaries in the Recommendation Statement that were materially misleading, which

19        is precisely what Defendants did.

20   •    Third, the statement on page 47 of the Recommendation Statement—that the Long-

21        Term Projections "did not adequately reflect the impact of COVID-19 on the

22        Company's programs and revenues" because they were "prepared with a focus on the

23        resources necessary to achieve long-term strategic goals rather than with a focus on

24        estimating the long-term value of the Company"—was materially misleading. As

25        conflictingly stated in the Recommendation Statement, the Long-Term Projections

26        *already* reflected the "significant uncertainty surrounding the impact of COVID-19 on

- 6 -

PALFORZIA and the uncertainties inherent in the Company's pipeline." *Id.* at 46. The Long-Term Projections that the Company's management – including Defendant Dallas – prepared were presented to Nestlé and the Board ***after*** rigorous market research concerning the impact of COVID-19 on the Company's revenues, and were therefore *already* reflective of those sensitivities. Nevertheless, with the Financial Advisors unable to find the Merger fair utilizing the Long-Term Projections, the Company's management – including Defendant Dallas – decided to slash its projections, with the stated reason being that the Long-Term Projections focused on achieving "long-term strategic goals" rather than estimating "long-term value." This is an arbitrary distinction, as under sound corporate finance theory, the value of a Company should be premised on the expected future cash flows of the corporation. Accordingly, Defendants approved or issued a Recommendation Statement that misleadingly characterized the adequacy of the Long-Term Projections in violation of Section 14(e) of the Exchange Act.

- <u>Fourth</u>, the Recommendation Statement omitted the market research conducted by Aimmune, which showed that the "COVID-19 pandemic has had little or no impacts on caregivers' willingness to stop their children on Palforzia." *See* Q1 2020 Earnings Call. This omission directly contradicted managements' decision to approve the Fairness Opinion Projections, which most closely resembled the Least Favorable Scenario of the Long-Term Projections. It is of obvious importance to stockholders to have all material information that may have contradicted managements' decision to approve the projections utilized by the Financial Advisors when creating their fairness opinions. This omission led shareholders to believe that the Fairness Opinion Projections were reasonably prepared. Had the Company's market research been included in the Recommendation Statement, shareholders would have been able to

recognize the unreasonableness of the justifications for utilizing the significantly lower Fairness Opinion Projections.

11.    As a result of the material omissions and misstatements in the Recommendation Statement, the Tender Offer met its minimum condition, and the Merger was consummated. The materially false and misleading Recommendation Statement was an essential link in the completion of the Tender Offer, as it could not have occurred without the dissemination of the Recommendation Statement.

12.    For these reasons, and as set forth in detail herein, Plaintiffs assert claims against Defendants for violations of Sections 14(e) and 20(a) of the Exchange Act.  Plaintiffs seek to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(e), and 20(a) of the Exchange Act.

14.    Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

15.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391 because: (i) the conduct at issue took place and had an effect in this

District; (ii) Aimmune maintains its principal executive offices in this District and each of the Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; (iv) most of the relevant documents pertaining to Plaintiffs' claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**CLASS ACTION ALLEGATIONS**

16.    Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the other public shareholders of Aimmune (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

17.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable. As of September 10, 2020, there were 65,766,796 shares of Aimmune common stock outstanding, held by tens of thousands of individuals and entities scattered throughout the country. The actual number of public stockholders of Aimmune will be ascertained through discovery;

b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)    whether Defendants have misrepresented or omitted material information concerning the Merger in the Recommendation Statement, in violation of Sections 14(e) of the Exchange Act;

ii)    whether Defendant Dallas has violated Section 20(a) of the Exchange Act; and

c.      Plaintiffs are adequate representative of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## **PARTIES**

### I.     **Plaintiffs**

18.     As demonstrated in their respective certifications, Plaintiffs were, throughout all times relevant hereto, the owners of Aimmune common stock.

### II.     **Defendants**

19.     Defendant Aimmune was a public company incorporated under the laws of Delaware with principal executive offices located at 8000 Marina Blvd, Suite 300, Brisbane, CA 94005. Aimmune's common stock was traded on the Nasdaq under the ticker symbol "AIMT."

20.     Defendant Jayson D.A. Dallas ("Dallas") was, at all relevant times, the Company's President and Chief Executive Officer and a member of the Board.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

### III.    Relevant Non-Parties

21.    Stacey D. Seltzer ("Seltzer") was, at all relevant times, a director of the Company. Seltzer is currently a partner at Aisling Capital.

22.    Mark T. Iwicki ("Iwicki") was, at all relevant times, a director of the Company. In addition, Iwicki is the Chief Executive Officer and Chairman of the Board of Kala Pharmaceuticals, Inc. ("Kala"). Longitude Capital, which Enright (defined below) is a founder, is the beneficial owner of 9.25% of Kala's outstanding shares.

23.    Greg Behar ("Behar") was, at all relevant times, a director of the Company. Behar currently serves as Chief Executive Officer of Nestlé Health Science US Holdings, Inc., a subsidiary of Nestlé.

24.    Brett K. Haumann ("Haumann") was, at all relevant times, a director of the Company.

25.    Mark D. McDade ("McDade") was, at all relevant times, the Chairman of the Board of the Company.

26.    Patrick G. Enright ("Enright") was, at all relevant times, a director of the Company. Enright is a founder of Longitude Capital, which beneficially held 9.22% of the outstanding common stock of the Company. Additionally, Longitude Capital beneficially owned more than 5% of the common stock of companies affiliated with other members of the Board.

27.    Kathryn E. Falberg ("Falberg") was, at all relevant times, a director of the Company. Falberg is also a member of the board of directors of Tricidia, Inc., of which Longitude Capital beneficially owns approximately 6% of the common stock of the Company. Falberg previously served as Executive Vice President and Chief Financial Officer of Jazz Pharmaceuticals plc, during which time Longitude Capital had substantial holdings.

28.    Defendant Dallas and the individuals identified in paragraphs 21 through 27 comprised the Company's board of directors (previously defined as the "Board"). When referring to the "Board" pertaining to its role in the sales process of the merger, it is presumed that Behar is absent unless otherwise stated.

29.     Société des Produits Nestlé S.A. (previously defined as "Nestlé") is a société anonyme organized under the laws of Switzerland, as a nutrition, health and wellness company, best known for its food brands. Nestlé's wellness division is perhaps best known for its controversies beginning in the late 1970's and early 1980's. According to media outlets, Nestlé aggressively pushed a propriety breastfeeding formula in less economically developed countries, specifically targeting the poor. Nestlé marketed their infant formula as comparable to mother's milk, stirring ethical issues.

30.     Critiques of Nestlé allege that mothers in these developing countries, despite being able to read in their native language, were unable to read the language in which sterilization directions were written, and that, even if mothers understood the need to boil the water, they may not have had the facilities to do so. The United Nations International Children's Emergency Fund ("UNICEF") estimated that a formula-fed child living in disease-ridden and unhygienic conditions is between six (6) and twenty-five (25) times more likely to die of diarrhea and four (4) times more likely to die of pneumonia than a breastfed child. Today, several countries and organizations continue to boycott Nestlé, despite their claims to be in compliance with World Health Organization ("WHO") regulations. One committee, the International Nestlé Boycott Committee, monitors their practices. Several universities and student organizations have also joined the boycott, especially in the United Kingdom.

31.     Nestlé Health Science US Holdings, Inc. ("Nestlé Health Sciences" and included in any reference to "Nestlé") is a Delaware corporation and affiliate of Nestlé. Nestlé Health Sciences had an approximate 25.6% equity ownership stake in the Company, of which 19.6% was voting common stock and the remaining balance was non-voting preferred stock. Behar was, at all relevant times, the Chief Executive Officer of Nestlé Health Sciences.

32.     SPN MergerSub, Inc. (previously defined as "Merger Sub"), was a Delaware corporation and wholly-owned subsidiary of Nestlé and formed for the purpose of effectuating the Merger.

- 12 -

## SUBSTANTIVE ALLEGATIONS[2]

### I.    Background of The Companies

33.    Aimmune was a commercial-stage biopharmaceutical company developing a line of drugs designed to desensitize patients with common food allergies. Aimmune was established as the Allergen Research Corporation in 2011, changed its name to Aimmune Therapeutics, Inc. in May 2015, and became a publicly traded company in August 2015. As will be outlined in-depth below, Aimmune's first drug, Palforzia, was approved by the FDA to treat peanut allergies at the end of January 2020. The Company had begun its commercialization efforts of Palforzia right as the Pandemic struck, and as a result Aimmune's stock price tumbled. Nestlé, the Company's largest shareholder, took advantage of this situation to acquire the Company for a fraction of its value, despite insider statements and market research evidencing that Aimmune's prospects remained unchanged, including having $318 million of cash on hand as of June 30, 2020, which was "anticipated to fully fund the Company based on its current business plan." *See* Presentation Slide from the 2020 Wedbush PacGrow Healthcare Virtual Conference as of August 12, 2020.

34.    Nestlé became affiliated with the Company in November 2016, when it made a $145.0 million equity investment in Aimmune. Aimmune and Nestlé also entered into a strategic collaboration agreement, under which Aimmune retained all current and future pipeline assets developed with the CODIT approach, including AR101 (Palforzia), which was in Phase 3 clinical development. As a result of the equity investment, Aimmune received a payment of $145.0 million in connection with Nestlé Health Science's purchase of 7,552,084 newly issued shares of Aimmune's common stock at $19.20 per share, which corresponded to a 15 percent stake after the completion of the transaction. In addition, Behar, CEO of Nestlé Health Science, joined the Aimmune Board. In connection with the strategic collaboration and Nestlé Health Science's initial investment in Aimmune, Nestlé Health Science and Aimmune entered into a standstill agreement (the "Standstill Agreement") as amended from time to time, which imposed certain standstill restrictions that limited

---

[2]    Unless otherwise indicated, all emphasis added.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

the ability of Nestlé to, without the approval of a majority of the members of the Aimmune Board who are not affiliated with Nestlé, effect or seek to effect a transaction to acquire Aimmune through any means.

35.    In February 2018, Nestlé Health Science acquired an additional 937,500 Shares at a price of $32.00 per Share, for an aggregate consideration of $30.0 million, as part of a $202.4 million public offering of Shares. After giving effect to the issuance of these additional Shares, Nestlé Health Science's percentage ownership in Aimmune remained relatively unchanged.

36.    In November 2018, Aimmune entered into an extension of the strategic collaboration on similar terms and issued and sold to Nestlé Health Science an additional 3,237,529 Shares in a private placement at a price of $30.27 per Share, for an aggregate consideration of $98.0 million, increasing Nestlé Health Science's percentage equity ownership interest in Aimmune to approximately 19% of Aimmune's then outstanding Shares as of November 11, 2018. In connection with the extension of the strategic collaboration, the Standstill Agreement was amended and restated to, among other things, extend the standstill restrictions and market standoff provisions *through November 11, 2020*, each of which would otherwise have expired on November 23, 2018 absent the extension.

37.    In February 2020, Aimmune announced an additional $200.0 million equity investment by Nestlé Health Science and a further extension of the existing strategic collaboration, which would otherwise have terminated in November 2021. In connection with this additional investment and further extension, the Standstill Agreement was further amended and restated to, among other things, *extend the market standoff provisions through November 11, 2021*, which would otherwise have expired on November 11, 2020 absent the extension. The amended and restated Standstill Agreement did not extend the expiration date of the standstill restrictions, which remained November 11, 2020.

II.    **Background of the Transaction**

38.    The Tender Offer came in the midst of the Pandemic, at a time when equity markets

throughout the world were subject to great uncertainty and radical change. Prior to the Pandemic, the Company was trading as high as $37.00 per share. The Offer Price constitutes a 6.76% discount per share to its pre-COVID-19 trading price—even though commercialization of the Company's flagship drug had just begun. It is also well below a host of price targets that set the Company's market value above $58.00 per share. The Offer Price does not compensate stockholders for the intrinsic value of their shares and instead provides a substantial discount to Nestlé, the Company's largest shareholder.

### A.     Aimmune is Granted FDA Approval

39.     On January 31, 2020, the U.S. Food and Drug Administration ("FDA") approved the Company's flagship drug Palforzia. Palforzia is the ***first and only*** FDA approved therapy to suppress the effects of peanut allergies. The drug mitigates allergic reactions, including anaphylaxis that may occur with accidental exposure to peanuts. With peanut allergy being a life-long condition, Palforzia can ensure long-term sales for Aimmune, which, according to Roth Capital Research, could reach $1 billion by 2026. Meanwhile, GlobalData forecasts the drug could rake in over $3 billion of sales to claim more than 67% of the peanut allergy market in 2027.

40.     According to the FDA's January 31, 2020, press release:

> Peanut allergy affects approximately 1 million children in the U.S. and only 1 out of 5 of these children will outgrow their allergy. Because there is no cure, allergic individuals must strictly avoid exposure to prevent severe and potentially life-threatening reactions," said Peter Marks, M.D., Ph.D., director of the FDA's Center for Biologics Evaluation and Research. "Even with strict avoidance, inadvertent exposures can and do occur. When used in conjunction with peanut avoidance, Palforzia provides an FDA-approved treatment option to help reduce the risk of these allergic reactions in children with peanut allergy."

41.     The Company hailed the approval from the FDA as a breakthrough after years of clinical trials. Peanut allergies effect millions of people across the world, with *one in five* peanut-allergic pediatric patients visiting emergency rooms *each year* due to accidental exposures. As stated in the Company's January 31, 2020 press release announcing FDA approval:

> This is a defining moment for the peanut allergy community and for Aimmune Therapeutics, and we are excited to bring the first FDA-approved treatment for peanut allergy to patients and their families," said Jayson Dallas, M.D., President and CEO of Aimmune Therapeutics. "Our commercial field team is ready to begin engaging

- 15 -

with allergists to help them prepare to safely incorporate PALFORZIA into their practices and, with approval in hand, our payer team can also immediately begin work to secure formulary access to PALFORZIA. We view this approval as just the beginning for Aimmune, and it underscores our continued commitment to bringing innovative treatments to people with potentially life-threatening food allergies."

…

"Not only is PALFORZIA the first approved therapy for peanut allergy, but it is the first approved therapy for any food allergy," said Daniel Adelman, M.D., Chief Medical Officer of Aimmune Therapeutics. "We truly appreciate the efforts of the peanut allergy community who contributed to the development of PALFORZIA – including the more than 1,200 patients and their families who participated in our clinical trials, the study investigators and their staff, the advocacy community, and our dedicated employees – all of whom have helped us develop and deliver this first-of-its kind therapy."

## B.    Nestlé Increases Its Stake

42.    On the heels of this news, in February 2020, Aimmune announced an additional $200.0 million equity investment by a subsidiary of Nestlé. An analyst of Piper Sandler Companies ("Piper Sandler"), a leading investment bank and institutional securities firm, stated in a note that "with [Nestlé's] additional investment, we think the prospect of an outright take out by Nestlé (or anyone else for that matter) has to be factored in more than before." Importantly, Nestlé, however, was limited in its ability to conduct such negotiations due to the Standstill Agreement.

43.    Nestlé's interest in Palforzia was unsurprising, as the drug promised to be astronomically profitable. The cost of Palforzia in the U.S. per patient is, according to an 8-K filed with the SEC on January 31, 2020, $890 a month. Palforzia is not considered a curative treatment, which means that patients must continue to take the drug for months, perhaps years, to achieve desensitization. Indeed, the patients in the Phase III Palforzia trial continued to take Palforzia daily for approximately 24 weeks. Data presented at 2020 EAACI demonstrated the continued benefit of taking Palforzia following two years of treatment as well.

44.    At $890 a month (with a co-pay program that could reduce the patient's out-of-pocket costs to as low as $20 per month), the drug promised a steady stream of monthly revenue for Aimmune long after patients received their initial up-dosing under the supervision of a licensed allergist. The market opportunity was exceptionally large, with over 1.6 million peanut allergic children in the

United States alone. Palforzia's largest competitor, a drug created by DBV Technologies S.A. ("DBV Technologies"), *was denied FDA approval on August 4, 2020. Accordingly, the closest comparable drug could not possibly reach the market for years*. In short, Palforzia was (and still is) an extraordinarily profitable drug, with a massive market opportunity, *and no competitors*.

### C.    The Pandemic Causes the Company's Stock Price to Drop

45.    A few days following the announcement of FDA approval for Palforzia, on February 3, 2020, the United States declared a public health emergency due to the outbreak of COVID-19. The announcement came three days after the World Health Organization declared a Global Health Emergency as more than 9,800 cases of the virus and more than 200 deaths had been confirmed worldwide. In the following weeks and months, the virus swept through the nation and wrought devastation. By March 26, 2020, the United States became the country hit hardest by the Pandemic, with more than 80,000 confirmed cases and more than 1,000 deaths. It is in this moment that Palforzia was launched.

46.    In the midst of the Pandemic, the Company's stock price dropped from $31.05 on January 31, 2020, when FDA approval for Palforzia was announced, to a low of $11.51 on March 20, 2020 during the Pandemic's most uncertain phase. Despite the challenging environment, management of Aimmune remained extremely optimistic about Palforzia's prospects and expected revenues. In the Company's Q1 2020 Earnings Call on May 11, 2020, executives stated:

> We are working in unprecedented times due to the COVID-19 pandemic, with rapidly changing operating and economic environment. These present us and companies across the globe with unique challenges and uncertainty. The first thing I'd like to discuss is the impact of the pandemic on the PALFORZIA launch in the United States.
>
> In the first quarter, we received FDA approval for PALFORZIA. And following months of preparation, we were ready to launch in the United States. We're very proud the first patient received commercial PALFORZIA on Friday, March 13th. The following week, the first shelter-in-place orders went into effect, and the vast majority of allergists around the country stopped seeing patients in person other than for emergency visits. This has remained the case since then. Given that the initial dose escalation and the first dose of each new dose level of PALFORZIA need to be administered in the allergists' office, the overall impact has been a short-term pause in the ability of new patients to be initiated on commercial treatment.

However, we are still receiving requests for information from allergists who are interested in prescribing PALFORZIA and from parents who want to get their children on therapy as soon as they're able. While most allergists aren't able to start new patients on therapy now, they can get their patients enrolled in the REMS program during this time. When allergists are able to reopen their practices over the next few months, patients already enrolled in the REMS program will be ready for their initial dose escalation with it.

**As such, we believe the potential for PALFORZIA to be a blockbuster product as the first-ever approved therapy to treat any form of food allergy remains solidly intact. Although sales of PALFORZIA will be realized later than we had anticipated, we continue to remain in a strong financial position.**

…

Since the shutdown, we have conducted market research amongst allergists and caregivers to help us better understand what the PALFORZIA launch dynamics will look like after the shelter-in-place orders are lifted.

On the physician side, we expect that allergy practices will reopen regionally at varying rates **over the summer**. Allergists tell us that they are eager to reopen their practices and we're beginning to hear anecdotes of practice is planning to reopen in some parts of the country in the coming weeks. Our market research with caregivers is also very encouraging. **The results revealed that the COVID-19 pandemic has had little or no impact on caregivers' willingness to stop their children on PALFORZIA. In fact, over 70% of caregivers surveyed said that starting their child on PALFORZIA is a top priority as the country reopens. Thus, the fundamentals of our business have not changed.**

The interest in PALFORZIA amongst allergists and the need for patients to have an approved therapy for peanut allergy remained solid. All of our preparations thus far to launch PALFORZIA have positioned us well with allergists, caregivers and payers. In the interim, the body of evidence in support of PALFORZIA continues to grow. We will be presenting new PALFORZIA data at the European Academy of Allergy and Clinical Immunology or EAACI meeting, which will be held virtually from through June 6 through June 8. We will be presenting long-term safety, efficacy and immuno modulation beta of PALFORZIA as well as data on patient satisfaction with PALFORZIA treatment. We look forward to sharing these data with you following the meeting.

On the regulatory front, the review of PALFORZIA in Europe remains on schedule. We have submitted our responses to day 120 questions to the EMEA and continue to expect the review to be completed in the fourth quarter of this year. The Swissmedic review of PALFORZIA is also ongoing with a target action date of mid-2021.

…

Although the COVID-19 pandemic presented an immediate term challenge to allergists being able to start new patients on therapy, we recently completed market research, which helps us to better understand how allergists and patient caregivers are viewing the COVID-19 situation and their attitudes and beliefs towards PALFORZIA as a treatment option. Over the period of a few weeks, we were able to conduct both qualitative and quantitative research with approximately 150 allergists and over 400

patient caregivers.

I'd like to share some of the conclusions of this research with you now as well as actions that we are implementing as a result of what we've learned. Let me start by talking about what we've learned from physicians. And as you might imagine. [Indiscernible] allergists practices have been greatly impacted by the pandemic with average patient volume down by 65%. Almost all allergists we surveyed said that they were currently seeing no new patients in the COVID environment and the [indiscernible] majority taken several weeks of patient backlog to work through when they begin to reopen their practices. **Despite these short-term challenges, the allergists we surveyed indicated no change in their belief or enthusiasm for PALFORZIA as a treatment for the peanut-allergic patients and the majority said they still anticipated getting up to speed and starting patients on PALFORZIA during the summer months.**

…

Turning to the conclusions of the patient caregiver research, we saw that the COVID situation clearly impacts caregiver willingness to currently enter health care settings. And that most caregivers are postponing visits by allergists for routine environmental allergy shots. Looking ahead, 40% of respondents indicated that they expected that it would be **June** before they return to the allergists with their child and 80% indicated that they would return by August. **Very encouragingly, respondents indicated that the COVID-19 pandemic has had no impact on their willingness to start their children on PALFORZIA. More than 75% report that they would be highly or somewhat likely to start their child on PALFORZIA in both pre and post pandemic scenarios.**

…

**[D]espite the challenges of COVID-19, we were able to complete all of our pre-launch activities**, including the full implementation of our REMS program prior to the pandemic effectively shutting down the country. We believe we're in a strong position to support product uptake once patients are able to return to physicians' offices and look forward to continuing to work with allergists and their teams to help patients and their families suffering from the burden of peanut allergy.

47.     While short-term revenue forecasts were impacted by the spread of the Pandemic,

executives did not anticipate any material changes to Palforzia's long-term prospects. Indeed, as

disclosed above, Aimmune's market research showed that the Pandemic "has had no impact on their

willingness to start their children on PALFORZIA. More than 75% report that they would be highly

or somewhat likely to start their child on PALFORZIA in both pre and post pandemic scenarios."

Further, the Company was (and still is) well prepared to weather the Pandemic as it has a tremendous

stockpile of cash and cash equivalents on hand, in the amount of $318 million as of June 30, 2020.

48.     On June 9, 2020, at the Goldman Sachs 41st Annual Global Healthcare Conference

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

Webcast (the "Goldman Sachs Conference"), Defendant Dallas confirmed that: (i) the European regulatory process had not slowed down and was on track for approval at the end of the year; (ii) every allergist with whom Aimmune spoke had at least a hundred patients on their books, "and that would be on the lower end of things;" and (iii) *despite the Pandemic, Aimmune was exactly where it "[had] anticipated [it] would be in the course of a normal launch for a product that was approved at the end of January."* As stated by Defendant Dallas:

3:30-4:20, Dallas:

As these practices get back up and running, they are telling us it going to take them somewhere between a month or two to work through backlog obviously their priority in getting up and running again is patients they already have on immunotherapy and getting them back on track and as they do that in parallel they will start to integrate Palforzia into their practice.

We did fairly **extensive research** with both the allergy community as well as the caregiver-patient community about three weeks ago, and the sort of highlight from that and in the Q&A we may get into some of the detail, but the highlight from that was essentially that both sides of that equation are as motivated, or if not more motivated, to get treatment going and to get children with peanut allergy under treatment.

9:57-10:32, Dallas:

We had called on payors who covered about 95% of the lives, of those peanut allergy lives, prior to approval, and we've now gone back and started to reengage that, and I think as I sort of alluded to in my introduction, this an area where we haven't lost momentum at all, **I think we are exactly where we had anticipated we would be in the course of a normal launch for a product that was approved at the end of January**. By and large, payors are still having their clinical committee meetings, they're still having their P&T committee meetings, and so we are able to engage in that.

11:45-11:54, Dallas:

Our goal is to get 75-85% of lives covered, on a plan, by the end of this year, we are well on track to do that.

27:04-27:26, Dallas:

Europe, let's start with the regulatory process, right so, **the European regulatory process is one of the things that has not slowed down** or thus far, at least from a procedural perspective, been impacted by the various shutdowns and our clock and process in Europe has continued just as it would have had we not had a Pandemic.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

27:38-28:02, Dallas:

The process remains on track, and we do believe that we have previously guided to an expected action at the end of this year, in the fourth quarter, we believe that remains true, unless that something fundamental changes in the European regulatory process or in the E&A Agency process, which we don't expect. So things are on track for an approval at the end of the year.

38:12-38:22, Dallas:

There isn't an allergy practice that we have spoken to that doesn't have at least a hundred patients on their books, and that would the very lower end of things.

49.     Accordingly, while the Company's share price had not yet recovered to pre-Pandemic levels, Aimmune's financial prospects remained unchanged. It is unsurprising, therefore, that Nestlé became interested in taking the Company private while shares traded at a substantial discount to their intrinsic value. Despite ongoing standstill restrictions that should have prevented a transaction with Nestlé, in the second quarter of 2020, Nestlé saw an opportunity to acquire the Company (they knew was still valuable) on the cheap and the Company's management and Board capitulated.

**D.     Nestlé Initiates an Offer for Aimmune While Aimmune's Prospects Improve and Its Stock Price Remains Deflated**

50.     On July 7, 2020,  the board of directors of Nestlé delegated authority to Nestlé's chairman, Paul Bulcke, and chief executive officer, Ulf Mark Schneider, to review the results of an exploratory review of Aimmune's business, assess the recommendation of Nestlé Health Science with respect to a potential transaction, review the terms and conditions of any potential offer recommended by Nestlé Health Science with respect to a potential transaction and make the final determination as to whether to approve or reject the terms and conditions of any such offer.

51.     On July 10, 2020, representatives of Nestlé proposed to members of the Aimmune Board during a conference call that Nestlé and Aimmune should consider initiating exploratory discussions that could lead to a potential transaction, including the potential acquisition of Aimmune by Nestlé. The Nestlé participants on the call indicated that, although any acquisition of Aimmune

would require certain internal approvals, they believed that an indicative price of $30.00 per share could serve as a basis for exploratory discussions.

52.    There is no indication in the Recommendation Statement that, prior to Nestlé's outreach on July 10, 2020, Aimmune intended on conducting a sales process, outside of the ordinary, regular review of strategic alternatives that were available to Aimmune.

53.    On July 13, 2020, "representatives of Lazard discussed [a] preliminary analysis of potential valuations of Aimmune" with the "Independent Directors" (as defined in the Recommendation Statement), who, apparently based on this analysis, concluded that Nestlé's indicative price of $30.00 per share – while the stock was trading as low as $15.49 – was "not sufficient" to justify a waiver of the Standstill Agreement to permit further exploratory discussions with Nestlé.

54.    Over the course of the next several weeks, Aimmune and Nestlé discussed a baseline indicative price per share that would permit a waiver of the terms of the Standstill Agreement and allow exploratory discussions to take place. As part of this process, on July 21, 2020, the Board authorized the engagement of J.P. Morgan and Lazard as financial advisors for purposes of assessing a potential strategic transaction.

55.    After Nestlé revised its price upward, on July 23, 2020, the Independent Directors indicated to Nestlé that its revised potential price of $32.50 per share was also insufficient. On July 24, 2020, McDade, the Chairman of the Board, had a discussion with Behar, the CEO of Nestlé Health Sciences and member of the Aimmune Board, whereby McDade and Behar discussed potential process and timing for exploratory discussions. McDade reiterated that the Board believed an indicative price of $32.50 was insufficient.

56.    Nevertheless, after Nestlé raised its indicative offer to $34.00 per share, management provided a limited waiver of the standstill, continued discussions, and then on August 5, 2020, determined to provide a further waiver of the Standstill Agreement to conduct exploratory discussions with Nestlé. In connection with these waivers, on July 31, 2020, Aimmune's management presented

1  updates of its business, long-range planning, and business prospects to Nestlé; this presentation
2  included management's financial projections for Aimmune (discussed in depth below).

3      57.    During this time, management remained confident in Aimmune's prospects. The only
4  real "challenge" with the launch of Palforzia was that allergists' offices remained closed in the early
5  months of the Pandemic as many allergists were not considered "essential" for purposes of the
6  Pandemic. Accordingly, the Company was not generating revenues and, in conjunction with the
7  overall market reaction to the Pandemic, Aimmune's stock price remained depressed. Yet Aimmune's
8  fundamentals remained unchanged, these developments were not anticipated, and management
9  reiterated that the Company was well-positioned for tremendous growth within the next few months
10 and years. As stated by management in the Company's Q2 2020 Earnings Call on July 30, 2020:

> We were well prepared for the launch following PALFORZIA's approval at the end
> of January. Prior to the declaration of the U.S. national state of emergency due to
> COVID-19 in mid-March, our field teams had visited 3,000 allergists and were fully
> implementing our REMS program. As we entered the quarter in April, we conducted
> market research with 150 physicians and over 400 caregivers to understand how they
> were thinking about PALFORZIA in view of the new shelter-in-place requirements.
> From this market research, we were pleased to see that the demand for PALFORZIA
> as a treatment option had not diminished with either allergists or with caregivers. The
> results reinforced our expectation for the long-term potential of PALFORZIA.

> With this said, the research also highlighted that allergists anticipated that they would
> have an average appointment backlog of 2 to 3 months to work through once they
> reopen their practices, implying that it could be late summer before allergists began
> scheduling PALFORZIA patients. As we reflect on the second quarter, each month
> needs to be reviewed individually.

> In April, the majority of allergists offices were closed, and those that were not avoided
> starting new patients on therapies. Allergists were consumed with the likely impact of
> the pandemic on their practices and on their business. In May, the focus of allergists
> changed to how best to reengage with patients. Some allergists started reopening their
> practices. Our field force and medical science liaisons began to reengage both virtually
> and occasionally in-person with the allergists. As allergists' offices opened, the
> majority had a backlog of existing patients to treat before taking on new food allergy
> patients.

> June was a month of inflection. The majority of allergy practices around the country
> reopened in some form. We saw a steady pickup in all of our leading indicator launch
> metrics. Specifically, we saw an acceleration of allergists and patients enrolling in the
> REMS program and allergists starting new patients on PALFORZIA. Our practice
> account managers, or PAMs, began more broadly engaging with allergists in person,
> once again, to assist them with REMS certifications, train them and provide additional
> educational resources. This trend has continued through July.

28

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

1

…

2

We are highly encouraged by the leading indicators that we are seeing as the allergists'
offices begin to reopen after being shut down by the pandemic. We're just beginning

3

to ramp up our targeted consumer marketing activities, which will help facilitate
treatment consultations between patients and their allergists. And finally, despite the

4

pandemic, we've continued to make strong progress with payers in Q2, and we
anticipate further meaningful progress moving forward as more payers make coverage

5

determinations in Q3. All in all, we're well-positioned to support allergists and their
teams, and we look forward to helping more and more patients and their families who

6

are living with the burden of peanut allergy.

7

58.    In other words, just one month prior to signing the Merger Agreement, management

8

expressed their confidence in the long-term potential of Palforzia – a belief that was based on concrete

9

"market research with 150 physicians and over 400 caregivers to understand how they were thinking

10

about PALFORZIA in view of the new shelter-in-place requirements." The market research showed

11

"that the demand for PALFORZIA as a treatment option had not diminished with either allergists or

12

with caregivers. The results reinforced our expectation for the long-term potential of PALFORZIA."

13

And that revenues for Palforzia should increase following a 2-to-3-month window while allergists

14

reopen their practices.

15

59.    Following the Q2 2020 Earnings Call, on July 31, 2020, Aimmune's management

16

team delivered a presentation to Nestlé's management via video conference, which provided details

17

and updates of Aimmune's business, along with ***long-range planning*** and business prospects.

18

Accordingly, Nestlé would have received the same updates – *i.e.,* that the demand for Palforzia had

19

not diminished and that the long-range plan for Aimmune remained bright.

20

60.    On the morning of August 4, 2020, the Board held a meeting together with members

21

of Aimmune's management. Representatives of Latham & Watkins LLP ("Latham"), Aimmune's

22

legal counsel, were also present. Members of Aimmune's management were presented with the Most

23

Favorable Scenario of the Long-Term Projections (**not** the Least Favorable Scenario). The Board then

24

directed Aimmune's management to work with the Financial Advisors to identify other potential third

25

parties. As outlined below, though, the market check was entirely illusory and largely took place over

26

five (5) days, with five (5) parties, two (2) of which were contacted only via e-mail. Outreach for a

27

28

multi-billion-dollar strategic acquisition cannot honestly be considered genuine when representatives of the Financial Advisors did not even pick up the phone to request a meeting in person.

61.    Also, on August 4, 2020, Nestlé's management provided Aimmune with a letter providing indicative terms on which Nestlé's management believed an acquisition of Aimmune might be achievable, including an indicative price per Share of $34.00 – *i.e.,* terms largely similar to what was ultimately agreed to a few months later. Both parties were presented with and utilized the Most Favorable Scenario of the Long-Term Projections.

62.    On August 12, 2020, at the 2020 Wedbush PacGrow Healthcare Virtual Conference (the "Wedbush Conference"), Defendant Dallas reiterated: (i) that Aimmune was starting to see a nice inflection in terms of Palforzia uptake through June and into July and now continuing in August; (ii) that, from a financial position, Aimmune was very well capitalized; (iii) that most allergists have "a warehouse of patients, if you like, waiting to get onto to Palforzia therapy"; and (iv) that, as Aimmune gets into the third quarter, the number of patients will pop quite nicely.  As stated by Defendant Dallas:

> 5:42-6:05, Dallas:
>
> And so what we see, is that as [the allergists] reopen, they are taking a month or two to sort of get themselves back up and running, and to get all of those backlogged patients through their system, and when they are done with that, they see Palforzia as a great opportunity to now expand their practices and to now get back into business. **So we are starting to see a nice inflection in terms of uptake through June and into July and now continuing in August.**
>
> 8:13-8:27, Dallas:
>
> And then finally from a financial position, **we are very well capitalized, we are able to do everything I have just talked about, including the Palforzia launch in the U.S and in Europe with our existing resources** and we believe that we remain fully-funded on our current business plan.
>
> 9:40-12:00, Presenter:
>
> Let's talk about the launch of Palforzia, can you talk a little bit more about the impact of COVID-19 and how do you see Palforzia's launch over the next year or two once we come out of the COVID situation?

Dallas:

Yes so I have alluded to some of this, I think the first point to make is that the initial updosing on Palforzia as well as the initial dose in each of the initial updosing steps and there are eleven updosing steps over a period of six months um to get from the very very very low dose, the first dose that the patient takes, is about 1/600th of a peanut and we slowly, slowly increase that dose over time until they are taking the equivalent of a full peanut. That's eleven visits over six months, if you want to compare that to grass and pollen allergies, that's, those are somewhere between 69 and 87 visits over a three to five-year period.

So this is much quicker in terms of getting folks the therapeutic doses, but that is, those initial doses all must be done in the allergists' office under supervision and so that created a problem for us right as we launched during the months of March and April—when the bulk of allergy practices were simply shutdown—and then what we saw is that they reopened in May and into June, that they really weren't taking on new patients, they were essentially playing catch up and getting their backlogs treated. What we've seen now in the backend, sort of the second half of June going into July and into August, is that not only are the practices opened they are starting to introduce new patients into their practice and they are starting to introduce the treatment of Palforzia into their practices.

Very important in this, and something that is important to know, is that the process leading up to the initial doses of Palforzia can all be done remotely so the initial visit that the patient or the family would have with the allergy practice, the discussion around whether our immunotherapy is the right choice for that patient or not, the registering of the patient in the REMs program, the benefits of investigation to ensure that the insurance coverage is reasonable, and the ordering of the initial dosing kit that is shipped directly to the physicians' office can all be done remotely and can all be done online, so that the first time the patient actually has to physically show up in the allergy practices offices is for the that initial dose...

12:24-12:43, Dallas:

As we think about this, we expect the vast majority of allergy practices to get through their patient backlogs in the course of the next month or two and then we really do expect to see them start to introduce more methodically Palforzia into their practices through the backend of the summer and into the fall...

12:50-13:05, Dallas:

A lot of patients, and a lot of practices, tell us that they have a warehouse of patients, if you like, waiting to get onto to Palforzia therapy. So the demand is there, it is just about making certain that the practices are ready to treat these patients and that they got their catch-up work done.

14:00-14:15, Dallas:

Allergists pretty much told us we're opening in June, it is going to take us 2 to 3 months to work through the backlog, we expect to start really ramping up on Palforzia, prescribing, sort of going into August and September. **So the fact that we started seeing this happening in June and July is pretty encouraging.**

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

14:25-14:33, Dallas:

I'm very optimistic that as we get into the third quarter, we will see that number [the number of patients] pop quite nicely.

16:43-16:50, Dallas:

Many of [the allergists] have waiting lists, and many of them have patients that they know will be coming in.

20:53-21:15, Dallas:

**European regulatory process is another thing that has not been impacted thus far at all** by the COVID Pandemic, we are exactly where we expected to be within that process, and we remain on track for a decision by the European Medicines Agency by the end of this year. So that is very encouraging, and that process is going really quite well.

29:35-30:15, Dallas:

**We have the only approved treatment in any kind of food allergy, and the opportunity we think is extraordinarily large, and we think this is clearly going to be just as Palforzia [inaudible] pediatric indication in the U.S. alone is a billion plus dollar product. We are navigating the short-term here, to make sure that we do not mess with the opportunity in the long-term, and we do feel that as we come out into the fall, out of the summer, and into the fall this year we are gonna see what should have happened earlier this year,** in terms of the real uptake launch of Palforzia happening in the U.S., followed by approval in Europe. So we are very optimistic about the back end of next year, and the next couple years, as we build the Palforzia business around the world.

63.    On the morning of August 18, 2020, the Board held a meeting, together with members of Aimmune's management, at which the Financial Advisors and Latham were also present. Members of Aimmune's management provided an update as to recent discussions involving European commercial partners for Palforzia. Representatives of Latham provided an overview of the key terms of the draft merger agreement, including the termination fee that would be payable in the event of Aimmune's acceptance of a superior proposal, the conditions to closing and the required regulatory approvals. The Board directed management and Latham to continue discussions with Nestlé and Mayer Brown LLP ("Mayer Brown"), counsel for Nestlé, regarding the potential transaction. Accordingly, by this point in time, only a few days following the illusory market check and in anticipation of a strong third quarter, the Merger Agreement was nearing finalization.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

64.    On August 18, 2020, McDade had a discussion with Behar, during which Behar informed McDade that, although the necessary internal approvals had not been secured, "Nestlé's management envisioned a timeline that could result in the announcement of a transaction by the end of the week of August 24, assuming negotiations were successful." In other words, Nestlé – and not the Aimmune Board – was determining the dates for finalization of the Merger Agreement.

65.    On August 19, 2020, McDade had another discussion with Behar, during which McDade and Behar discussed the progress of Nestlé's due diligence, the status of Aimmune's review of the potential merger agreement, and potential timing of Nestlé's feedback regarding the exploratory review.

66.    While the standstill waiver and subsequent discussions were supposed to result in a significantly higher price, ultimately, on August 24, 2020, Nestlé communicated that Aimmune would need to decide if $34.00 was an acceptable per share price, *to which the Financial Advisors responded that the $34.00 did not reflect a full valuation*, and therefore Nestlé should consider an improvement to the indicative price.

67.    On August 25, 2020, McDade and Behar had a discussion, during which McDade indicated to Behar that there was currently not a consensus among the remaining members of the Board as to whether a transaction at an indicative price of $34.00 per share price would be acceptable to them.

68.    On the morning of August 26, 2020, members of Aimmune's management had a discussion with certain members of Nestlé's management. During the discussion, the members of Nestlé's management pushed for a transaction at a price of $34.50 per share.

69.    On the afternoon of August 27, 2020, Nestlé sent an offer letter (the "Offer Letter") to Aimmune, proposing to acquire the Company at a price of $34.50 per share. A draft merger agreement was attached to the Offer Letter, the terms and conditions of which were substantially similar to the August 26, 2020 draft merger agreement provided by Latham during the exploratory discussions.

70.    On the evening of August 27, 2020, Latham sent a revised draft of the merger agreement and a revised draft of the Aimmune disclosure letter to Mayer Brown. Overnight, Mayer Brown sent comments on the merger agreement and Aimmune disclosure letter back to Latham.

71.    At the very same time that the draft merger agreement was being circulated and Mayer Brown was turning comments overnight, it appears that the Fairness Opinion Projections were created. The Fairness Opinion Projections were presented to the Independent Directors during a meeting of the Independent Directors on August 27, 2020, and to J.P. Morgan and Lazard in connection with their respective opinions to the Independent Directors and related financial analyses. As stated in the Recommendation Statement:

> The Company [Fairness Opinion] Projections were presented to the Independent Directors during the meeting of the Independent Directors on August 27, 2020, and to J.P. Morgan and Lazard in connection with their respective opinions to the Independent Directors and related financial analyses.

72.    Prior to the creation of the Fairness Opinion Projections, the Most Favorable Scenario of the Long-Term Projections were utilized throughout the sales process, including on July 31, 2020 and August 4, 2020, and formed the basis of Nestlé's initial, substantially similar offer of $34.00 per share. The Fairness Opinion Projections, on the other hand, most closely align with the Least Favorable Scenario, which were not utilized and reflected assumptions that, as stated above, were discredited by Defendant Dallas at investor conferences and by the Company's own market research. As such, the last-minute creation of the Fairness Opinion Projections could not reasonably be for any purpose other than to be utilized in the Financial Advisors' fairness opinions to justify the unfair Offer Price.

73.    On the day after the creation of the Fairness Opinion Projections, August 28, 2020, representatives of J.P. Morgan and Lazard each reviewed with the Board their respective financial analyses of the potential transaction and each delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion dated August 28, 2020, to the effect that, as of that date and based on and subject to various assumptions and limitations described in their respective

opinions—including their assumptions (at the consent of the Company) that the Fairness Opinion Projections were reasonably prepared on bases reflecting the best available estimates and judgments as to the future financial performance of the Company—the Offer Price was fair.

74.    Later on August 28, 2020, Latham sent proposed final versions of the merger agreement and the Aimmune disclosure letter to Mayer Brown.

75.    On the morning of August 29, 2020, Mayer Brown confirmed to Latham that the terms presented in Latham's proposed final versions of the merger agreement and the Aimmune disclosure letter were in final form and that Nestlé had no further comments.

76.    Later on August 29, 2020, Aimmune and Nestlé executed the Merger Agreement.

77.    In the early hours of the morning on August 31, 2020, Aimmune and Nestlé each issued a press release announcing the execution of the Merger Agreement.

**E.    The Woefully Inadequate Sales Process, Conflicted Board, and Preclusive Deal Devices**

78.    As outlined above, Nestlé initiated and drove the sales process. Nestlé first approached Aimmune on July 10, 2020, with a "indicative price" essentially constituting an offer for the Company. Thereafter, the CEO of Nestlé Health Sciences, Behar, who was on the Board of Aimmune, had one-on-one discussions with the Chairman of the Board, McDade, regarding the potential process and timing for exploratory discussions and the consideration to be received by stockholders.

79.    The inadequacy of the sales process is further evinced by the woefully inadequate efforts to contact other potentially interested parties. On August 4, 2020, members of Nestlé's management indicated to members of Aimmune's management by conference call that it could potentially consider an indicative price of $34.00 per Share, just $0.50 less than the Offer Price. The next day, the Aimmune Board directed the Financial Advisors to contact five parties and assess their potential interest in pursuing a strategic transaction with Aimmune.

80.    This entire market check was illusory. It largely took place over five (5) days, with five (5) parties, two (2) of which were contacted only via e-mail. Outreach for a multi-billion-dollar merger proposal cannot honestly be considered genuine when representatives of the Financial Advisors did not even pick up the phone to request a meeting in person, especially in light of Nestlé's significant holdings in Aimmune. As outlined below:

a.    Party A was contacted via e-mail on August 5, 2020. The Recommendation Statement indicates that representatives of the Financial Advisors did not follow-up on this email, nor did they call Party A. Thirteen (13) days later, Party A contacted the Financial Advisors to indicate it was not interested.

b.    Party B was contacted via e-mail on August 5, 2020. On August 7, 2020, representatives of the Financial Advisors held a telephonic discussion with a member of Party B's business team and Party B noted it would discuss the opportunity internally. On August 10, 2020, Party B informed the Financial Advisors to indicate it was not interested.

c.    Party C was contacted via e-mail on August 5, 2020. On August 6, 2020, representatives of the Financial Advisors held a telephonic discussion with a member of Party C's business development team and that same day Party C indicated it was not interested.

d.    Party D was contacted on August 5, 2020 by representatives of the Financial Advisors via telephone. Representatives of the Financial advisors subsequently had a telephonic discussion with a member of Party D's business development team with respect to a potential strategic transaction with Aimmune. On August 10, 2020, Party D informed the Financial Advisors to indicate it was not interested.

e.    Party E was contacted on August 6, 2020, and exchanged correspondence via email regarding the opportunity. Party E noted they had discussed the

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

opportunity internally and were not interested in pursuing a potential strategic transaction with Aimmune.

81.    On the morning of August 11, 2020, the Independent Directors held a telephonic meeting, together with members of Aimmune's management, at which representatives the Financial Advisors and Latham were also present. The Financial Advisors provided an update on discussions with the five alternative third parties that had taken place in the previous days, explaining that Parties B, C, D and E had each indicated that it was not interested in pursuing a strategic transaction with Aimmune and that Party A had not yet responded to the Financial Advisors' email. This was the extent of the market check, and it was inadequate to assess whether any other potential bidders were interested in the Company.

82.    What is more, the Board, for their part, capitulated to their largest shareholder, oversaw this illusory market check, and sold the Company off, all in exchange for lucrative personal compensation.

83.    Indeed, three of the eight Board members are beholden to Longitude Capital, which was founded and is controlled by director Enright. Longitude Capital received over $200 million in cash for their significant holdings in the Company, an otherwise illiquid position. A large stockholder such as Enright is much more inclined to agree to consideration below the Company's intrinsic value, as the lower consideration constitutes an illiquidity discount. Directors Falberg and Iwicki serve on boards of other companies where Longitude Capital holds greater than 5% beneficial ownership and so had every incentive to vote in favor of the Tender Offer with Enright. For their part, they received millions of dollars in cash upon completion of the Tender Offer.

84.    Defendant Dallas, the Company's Chief Executive Officer, remained employed in the post-merger company through December 2020. Defendant Dallas also received a golden parachute of nearly $9 million dollars and received $7 million in cash for his unvested Company options and Company restricted stock units. Therefore, he had enormous financial incentive to vote in favor of the Tender Offer.

1      85.     Behar is the Chief Executive Officer of Nestlé Health Science, a subsidiary of Nestlé,

2  and so is directly involved with the buyer. Accordingly, Defendant Dallas, Behar, Enright, Falberg,

3  and Iwicki all have various conflicts that would weigh heavily on their decision to approve the

4  Tender Offer at an unfair price. Yet, the Board failed to form a special committee to guard against

5  these conflicts.

6      86.     As for the remaining "independent" directors, former Delaware Chief Justice Leo E.

7  Strine, Jr. aptly explains the derivation of their indifference:

> This fundamental fact--that human investors are now largely spectators to the game--is known and occasionally kept in mind. Most prominently, it has been reflected in trying to address the reality that who we think of normatively as "owners" in the real sense do not exist. The most high-profile of those efforts was to get CEOs to think like owners rather than as highly, but reasonably, paid salaried workers. Instead of steady captains of safe, stable ships, money managers wanted American CEOs to be risk takers, going hell-bent for equity gains, even if that meant hurting or compromising constituencies like workers through downsizings or communities through plant closings and offshoring. Money managers, activists of many kinds, and other interests called for management to get paid in equity, with the growth of stock options being among the first results of that advocacy--to align them with the so-called "owners," those who hold corporate stock. These owners in turn called for more and more independent directors--fiduciaries with no prior ties to the company or its indirect competitors, suppliers, or customers--to check management even more. To make them think like owners, independent directors were supposed to be paid in equity. The compensation of these independent directors has grown enormously. And it creates strong incentives for directors to support transactions that involve a sale of the company and will therefore unlock the capital that they would otherwise be required to keep invested. Not only that, because of the influence of proxy advisors and certain vocal institutional investors, independent directors who wish to remain on the independent director circuit--which likely comprises almost all of them--are highly sensitive to resisting institutional campaigns at any company on whose board they serve, for fear that they will be targeted for withhold campaigns at all companies with which they are affiliated. That fear is rational because the leading proxy advisory firms look at director performance at other companies when voting at particular companies, and so do the largest investment fund.

*See* Leo E. Strine, *Who Bleeds When the Wolves Bite?: A Flesh-and-Blood Perspective on Hedge Fund Activism and Our Strange Corporate Governance System*, 126 Yale L.J. 1870, 1926 (April 2017).

      87.     What is more, the Tender Offer was all but certain to be completed after the signing of the Merger Agreement, as Longitude Capital and Nestlé together hold nearly 30% of the

outstanding common stock of the Company. Yet, there was no majority-of-the-minority provision in place that would have prevented the Tender Offer from going forward if a majority of the non-insider stockholders failed to tender their shares. This is a standard clause in a merger when a large stockholder is taking a company private, to prevent the sort of self-interest that is rampant here.

88.     For good measure, in order to effectuate the Tender Offer, the Defendants agreed to certain restrictive and preclusive deal protection devices that impeded the Company's ability to obtain a better offer or terminate the agreement. For example, the Company entered into a "No Solicitation" provision that prohibited it from seeking a better offer for stockholders. According to the Merger Agreement, if Aimmune terminated the agreement, it would also have to pay Nestlé a $85 million dollar termination fee. Lastly, Nestlé's approximate 25% ownership of the Company and role on the Board made it unlikely than any superior offer would be forthcoming.

89.     And so, piggybacking off the Pandemic and the Company's depressed stock price, the Tender Offer provided a substantial discount to the Company's largest shareholder, Nestlé, at the expense of the common stockholders, who did not see the intrinsic value of their shares realized nor were able to partake in the continued growth of the Company.

III.    **The Company Issues the Materially Deficient Recommendation Statement Which Utilized Unreasonable Projections**

90.     The Fairness Opinion Projections included in the Recommendation Statement do not reflect management's best available estimates or judgments for the future financial performance of the Company. Instead, the Fairness Opinion Projections most closely reflect an earlier worst-case scenario of projections (which were never provided to Nestlé or any of the other bidders) and they were presented to the Board for the first time just one day prior to the rendering of the fairness opinions. Both the circumstances of their creation and market research performed by the Company showing undiminished demand for Palforzia support the conclusion that the use of the Fairness Opinion Projections was unreasonable.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

91.     The Long-Term Projections were initially created by management after the spread of the Pandemic and *already* reflected "the significant uncertainty surrounding the impact of COVID-19 on PAFORZIA and the uncertainties inherent in the Company's pipeline." Rec. Stmt. 46. They also *already* "represented the possibility of an extended adverse effect of COVID-19 on the Company's programs." *Id.* The Long-Term Projections were broken down into three scenarios: Most Favorable; Least Favorable; and Middle-of-the-Road. And they were "prepared to facilitate discussions related to probability of success of certain of the Company's programs and initiatives." *Id.* The Least Favorable Scenario of the Long-Term Projections drastically provided for a ***50% reduction in revenue*** across all of the Company's programs.

92.     On July 31, 2020, the Most Favorable Scenario of the Long-Term Projections was presented to Nestlé during the merger negotiations. It appears that none of the significantly lower projections were *ever* presented to Nestlé for their consideration in the merger process, despite Nestlé being the Company's largest shareholder and having representation on the Board. It also appears that none of the other bidders received any of the lower projection sets. The most logical conclusion for withholding ***significantly*** lower projection scenarios from the Company's largest shareholder is that they were never truly believed in as realistic.

93.     On August 4, 2020, the Board was presented with a slightly modified version of the Most Favorable Scenario, along with two other scenarios that collectively represented a range of possible outcomes pertaining to the likelihood of achieving the Company's long-term strategic plans, taking into account various possible effects of COVID-19 and the various assumptions identified above: the Middle-of-the-Road Scenario of the Long-Term Projections, which represented the possibility of an extended adverse effect of COVID-19 on the Company's programs, and the Least Favorable Scenario of the Long-Term Projections, which considered the impact on the Company of a 50% reduction in revenue across all of the Company's programs. Ultimately, the Board relied on the Long-Term Projections *throughout the merger process* and prepared them to facilitate discussion related to the probability of the Company's success.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

94.     It was not until August 27, 2020 – *after* Defendant Dallas publicly stated that the Company was already "starting to see a nice inflection in terms of uptake through June and into July and now continuing in August" and that "we do feel that as we come out into the fall, out of the summer, and into the fall this year we are gonna see what should have happened earlier this year," but just *one day* before the Financial Advisors delivered their fairness opinions – that the Board was presented with the Fairness Opinion Projections.

95.     Despite the Fairness Opinion Projections never having been provided to Nestlé (or any other bidder) nor reflecting the in-depth market research performed by the Company that reinforced expectations for the long-term success of Palforzia, the **substantially lower** projections were to be used by the Financial Advisors to render their fairness opinions. As outlined above (*supra* ¶7, chart and graph), the Fairness Opinion Projections *significantly reduced* the Long-Term Projections and directly contradicted Defendant Dallas' statements.

96.     The timing of these changes – on the day before the Board needed fairness opinions – and the Company's prior statements strongly suggest that the projections were reduced to secure the fairness opinions and not in a legitimate exercise of business judgment.

97.     For example, while the launch of Palforzia was ultimately hampered by the spread of the COVID-19 coronavirus, that spread cannot singlehandedly explain this significant long-term reduction. Indeed, many of the largest reductions are in the later years, some five to ten years from now, long after the Pandemic was projected to be over.

98.     What is more, as noted above, the Long-Term Projections already accounted for Pandemic uncertainties, and perhaps the most unreasonable aspect of the Fairness Opinion Projections is that management conducted market research that completely negated any shift to a more pessimistic outlook for Company. Rather, management had only just one month prior communicated their expectation that the Company would meet its long-term potential.

99.     Indeed, in the months following FDA approval, *and in the midst of the Pandemic*, the Company specifically conducted in-depth quantitative and qualitative market research to evaluate

COVID-19's impact on future revenues for Palforzia. The results revealed that the "COVID-19 pandemic has had little or no impacts on caregivers' willingness to stop their children on Palforzia," and management stated as recently as July 31, 2020, *just one month prior to signing the Merger Agreement*, that the results "reinforced [the Company's] expectation for the long-term" success of Palforzia. *See* Earnings Call, Q2 2020 (incorporated herein by reference). Further, the Company was (and still is) well prepared to weather the Pandemic, as it has a tremendous stockpile of cash and cash equivalents on hand, in the amount of $318.1 million as of June 30, 2020. The mammoth upside potential for Palforzia is why analysts have called the Merger a "steal" for Nestlé, projecting that the peanut allergy market could bring in billions of dollars in sales.

100.    Indeed, in the Company's Earnings Call for Q1 2020, management for the Company had stated that, because of the challenges presented by the Pandemic, "we have conducted market research amongst allergists and caregivers to help us better understand what the PALFORZIA launch dynamics will look like after the shelter-in-place orders are lifted." The result of that research was "very encouraging. The results revealed COVID-19 pandemic has had little or no impacts on caregivers' willingness to stop their children on PALFORZIA. In fact, over 70% of caregivers surveyed said that starting their child on PALFORZIA is a top priority as the country reopens. Thus, the fundamentals of our business have not changed."

101.    The market research was exceptionally thorough and took place "over the period of a few weeks, [the Company was] able to conduct both qualitative and quantitative research with approximately 150 allergists and over 400 patient caregivers." And, "very encouragingly, respondents indicated that the COVID-19 pandemic has had no impact on their willingness to start their children on PALFORZIA."

102.    The reliability of the market research was reemphasized in the Company's Q2 2020 Earnings Calls. Management again discussed their "market research with 150 physicians and over 400 caregivers to understand how they were thinking about PALFORZIA in view of the new shelter-in-place requirements." The research showed "that the demand for PALFORZIA as a treatment option

had not diminished with either allergists or with caregivers. The results reinforced our expectation for the long-term potential of PALFORZIA." Furthermore, management was encouraged by their belief that patients would begin to be initiated on Palforzia following a 2-to-3-month window while allergists reopen their practices. Accordingly, as a result of the Company's qualitative and quantitative research, the Board had no objective reason to believe there to be a likelihood of an extended adverse effect on their revenues due to COVID-19 to justify slashing their revenue projections by over 40% one day before the fairness opinions were presented.

103.    What is more, prior to the Pandemic, the Company was trading as high as $37.00 per share – on January 16, 2020, *before* Palforzia was even approved by the FDA. The Offer Price thus constituted a 6.76% discount per share to its pre-COVID-19 trading price – even though production of the Company's flagship drug was just beginning. The Offer Price was also well below analyst price targets, which set the Company's market value above $60.00 per share.

104.    Simply put, the Offer Price did not compensate stockholders for the intrinsic value of their shares and instead provided a substantial discount to Nestlé, the Company's largest shareholder; the Fairness Opinion Projections were illegitimate and not reflective of the expected future financial performance of Aimmune; there was no proper business purpose for approving a new set of projections one day before the Financial Advisors delivered their fairness opinions, other than for the Financial Advisors' use; had the Financial Advisors utilized the Long-Term Projections, their analyses would have found significantly higher implied equity ranges above the Offer Price; and Defendant Dallas and Aimmune management knew the Company's anticipated financial performance was much higher and supported by market research, but nevertheless prepared the Fairness Opinion Projections so that the Company's Financial Advisors could utilize them to justify their fairness opinions, ***which were rendered just one day*** after the Fairness Opinion Projections were approved.

## IV.    Defendants' Omissions and Materially Misleading or False Statements

105.    On September 14, 2020, Defendants caused the Recommendation Statement to be filed with the SEC and disseminated to Aimmune's stockholders to solicit their approval of the merger.

106.    Defendant Dallas, as a director and officer of the Company, had a duty to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. Furthermore, Defendant Dallas was required to review the Financial Advisors' analyses in connection with his receipt of their fairness opinions, question the Financial Advisors' representatives as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Recommendation Statement and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. However, as set forth herein, the Recommendation Statement contained materially false and/or misleading statements which Defendant Dallas knew were false or misleading, in violation of Sections 14(e) and 20(a) of the Exchange Act.

107.    As set forth above, the Recommendation Statement contained four categories of materially false and/or misleading statements and/or omissions.

108.    <u>First</u>, the Fairness Opinion Projections themselves on pages 45-46 of the Recommendation Statement were materially false and misleading as they did not reflect managements' actual reinforced expectations for the long-term success of Palforzia based off extensive market research. Instead, the Fairness Opinion Projections reflected a drastic reduction to revenue rendered on the eve of the Financial Advisors' issuing their fairness opinion to justify "fairness". There was no sound business reason for the Fairness Opinion Projections; rather, statements made by the executives just one month prior indicate that they had a high degree of confidence in there being no disruption long-term to Palforzia sales due to COVID-19. Several statements made by Defendant Dallas support the conclusion that the changes to Aimmune's projections were unreasonable:

   a. European regulatory process is another thing that has not been impacted thus far at all by the COVID Pandemic, we are exactly where we expected to be within that process, and we remain on track for a decision by the European Medicines Agency by the end of this year. So that is very encouraging, and that process is going really quite well. *See* Wedbush Conference at 20:53-21:15.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

b.  The process remains on track, and we do believe that we have previously guided to an expected action at the end of this year, in the fourth quarter, we believe that remains true, unless that something fundamental changes in the European regulatory process or in the E&A Agency process, which we don't expect. So things are on track for an approval at the end of the year. *See* Goldman Sachs Conference at 27:38-28:02.

c.  A lot of patients, and a lot of practices, tell us that they have a warehouse of patients, if you like, waiting to get onto to Palforzia therapy. So the demand is there, it is just about making certain that the practices are ready to treat these patients and that they got their catch-up work done. *See* Wedbush Conference at 12:50-13:05.

d.  As we think about this, we expect the vast majority of allergy practices to get through their patient backlogs in the course of the next month or two and then we really do expect to see them start to introduce more methodically Palforzia into their practices through the backend of the summer and into the fall... *See* Wedbush Conference at 12:24-12:43.

e.  I'm very optimistic that as we get into the third quarter, we will see that number [the number of patients] pop quite nicely. *See* Wedbush Conference at 14:25-14:33.

f.  We have the only approved treatment in any kind of food allergy, and the opportunity we think is extraordinarily large, and we think this is clearly going to be just as Palforzia [inaubile] pediatric indication in the U.S. alone is a billion plus dollar product. We are navigating the short-term here, to make sure that we do not mess with the opportunity in the long-term, and we do feel that as we come out into the fall, out of the summer, and into the fall this year we are gonna see what should have happened earlier this year, in terms of the real uptake launch of Palforzia happening in the U.S., followed by approval in Europe. So we are very optimistic about the back end of next year, and the next couple years, as we build the Palforzia business around the world. *See* Wedbush Conference at 29:35-30:15.

109.    Again, the Long-Term Projections were prepared during COVID-19, *already* reflected its risks, and were utilized through as recently as August 4, 2020, just a few weeks prior to the signing of the Merger Agreement. In other words, the Long-Term Projections, and specifically the Most Favorable Scenario were not overly optimistic, and they properly accounted for any challenges facing Aimmune's business.

110.    The Recommendation Statement and its amendments also did not adequately disclose the changes to the assumptions that created such a drastic change in the Company's projections. However, at least two known assumptions are facially unreasonable.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

111.    First, regarding European approval for Palforzia, the Company utilized an unreasonable likelihood of it being approved as an input justifying the lower projections (80% probability of success, as disclosed in one of seven amendments to the Recommendation Statement and filed with the SEC on September 29, 2020). As evidenced by Defendant Dallas' public statements, though, European approval "had not been impacted thus far at all by the COVID-19 Pandemic." Indeed, *just two days after the Tender Offer was consummated*, Aimmune announced that it had received a positive opinion for the European Medicines Agency's ("EMA") Committee for Medicinal Products for Human Use ("CHMP"), which adopted a positive opinion on Palforzia recommending approval. Then, prior to the end of the year, on December 21, 2020, Aimmune announced that the European Commission had approved Palforzia.

112.    Furthermore, on August 31, 2020, in an interview with Behar aired on CNBC, he stated that "we are looking at currently progressing the review in the European Union, this should conclude towards the end of this year, and we are looking at launching early 2021 in Europe. Switzerland is also supposed to follow through in 2021 early, and then what we'll continue to do is through a process which is called 'mutual recognition' we will launch everywhere in the world following those milestones"[3] In other words, at the time the Merger Agreement was executed, Palforzia was fully expected to be approved for distribution in Europe, and the Fairness Opinion Projections utilized an unreasonable input regarding this probability. Palforzia is currently expected to launch in Germany and in the United Kingdom in May 2021.

113.    And second, as again outlined above (*supra* ¶7, chart), the Fairness Opinion Projections unreasonably assumed massive revenue decreases as compared to the Long-Term Projections in the out-years, *long* after any potential affects from the Pandemic would have long since vanished. These assumptions were again directly contradicted by Defendant Dallas' contemporaneous statements, as outlined above.

---

[3]    CNBC International TV, *Food allergies an immense opportunity, Nestle Health Science chief says*, YOUTUBE (Aug. 31, 2020), https://www.youtube.com/watch?v=Uaep5BKYGTQ (last accessed Feb. 6, 2021).

114.    For example, on May 11, 2020, he stated that, "[d]espite these *short-term challenges*, the allergists we surveyed indicated no change in their belief or enthusiasm for PALFORZIA as a treatment for the peanut-allergic patients and the majority said they still anticipated getting up to speed and starting patients on PALFORZIA during the summer months." On the same day, he also stated that, "[d]espite the challenges of COVID-19, we were able to complete all of our pre-launch activities." A few days later, on June 9, 2020, he stated: "I think *we are exactly where we had anticipated we would be in the course of a normal launch for a product that was approved at the end of January*." And, on August 12, 2020, he confirmed that the affects of the Pandemic had *already* begun to abate, noting that "we are starting to see a nice inflection in terms of uptake through June and into July and now continuing in August." Later in the same remarks, he confirmed the short-term effect of the Pandemic: "We are navigating *the short-term* here, *to make sure that we do not mess with the opportunity in the long-term*, and we do feel that as we come out into the fall, out of the summer, and into the fall this year we are gonna see what should have happened earlier this year."

115.    These statements directly contradict the massive decreases in revenue reflected in the Fairness Opinion Projection's out-years. For example, in 2029 and 2030, respectively, the Most Favorable Scenario of the Long-Term Projections projected $3.6 and $4.6 billion in revenue, while the Fairness Opinion Projections ultimately used by the Financial Advisors projected just $1.5 and $1.7 billion. Indeed, the revenue projections in these years were hundreds of millions of dollars less than even the Least Favorable Scenario of the Long-Term Projections. Any temporary impact of the Pandemic simply could not have reasonably caused these incredible long-term reductions, revealing the illegitimacy of the Fairness Opinion Projections.

116.    Although the remaining changes to the inputs and assumptions underlying the projection scenarios were omitted, these facts alone indicate that the Fairness Opinion Projections were not actually believed in by Defendant Dallas. Defendants nevertheless directed the Financial Advisors to utilize only the substantially worse Fairness Opinion Projections approved one night prior for use in their analyses to tout as evidence to shareholders that the $34.50 Offer Price was fair.

Accordingly, the projections on pages 45-46 of the Recommendation Statement were misleading as stated.

117.    <u>Second</u>, concerning the summaries of the valuation analyses performed by J.P. Morgan and Lazard conducted in conjunction with their fairness opinions on pages 32-44 of the Recommendation Statement, along with "implied value per share" ranges, the Defendants knew that those valuation analyses and value per share ranges were fallacious and did not accurately reflect the implied value of the Company's shares and the fairness of the Offer Price. Nevertheless, the Financial Advisors relied solely upon the illegitimate Fairness Opinion Projections to conduct their valuations because Defendants told the  Financial Advisors that the Fairness Opinion Projections were reasonably prepared on bases reflecting the best available estimates and judgments as to the future financial performance of the Company, which was not true. The law did not require Defendants to obtain fairness opinions, and it certainly did not require them to obtain opinions based upon concocted financial projections that did not reflect Aimmune's actual future financial prospects. They secured the fairness opinions to help convince shareholders to tender their shares. But, in so doing, Section 14(e) of the Exchange Act prohibited them from including valuation analyses summaries in the Recommendation Statement that were materially misleading, which is precisely what Defendants did.

118.    As a leading scholar on the issue explained in one of the most thorough analyses of the issues that plague the fairness opinion process:

> [C]urrent fairness opinion practice is still deeply flawed. Fairness opinions, and their underlying valuation analyses, are prone to subjectivity and are frequently prepared utilizing methodologies that simply do not jibe with best practices. These defects are exacerbated by the recurring problem of investment banks who are conflicted in their provision of fairness opinions…conflict arises where a bank is asked to opine and advise on a transaction that it stands to benefit from only if the transaction transpires. In fact, under the fee structure explicated above the bank will not be paid if it cannot find fairness. This charge can be made even if the fairness opinion compensation is paid separate from the larger success fee. If the transaction occurs, the remaining overall compensation is significant enough to raise conflict issues.

> This explicit conflict is also accompanied by a more subtle one. The relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that span more than one transaction. In these situations, investment banks may be influenced to find a

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

1    transaction fair to avoid irritating management and other corporate actors who stand
     to benefit from the transaction.  This will ensure future lucrative business.

2    Steven M. Davidoff, *Fairness Opinions*, 55 AM. U.L. REV. 1557, 1562, 1587 (August 2006).

3        119.    As a result, "a fairness opinion from an investment bank" has become "a practical

4    requirement to get the deal done." Troy A. Paredes, *Corporate Decisionmaking: Too Much Pay, Too*

5    *Much Deference; Behavioral Corporate Finance, CEOs, and Corporate Governance*, 32 FLA. ST.

6    U.L. REV. 673, 723 (Winter, 2005).  As one scholar put it, "obtaining a fairness opinion has become

7    like the practice of buying indulgences prior to the Protestant Reformation, but for sins that one is

8    about to commit instead of for past sins. The practice is very widespread but is not entirely legitimate."

9    Jonathan R. Macey, *The Regulator Effect In Financial Regulation*, 98 CORNELL L. REV. 591, 618-

10   19 (March, 2013).

11       120.    <u>Third</u>, the statement that the Long-Term Projections "did not adequately reflect the

12   impact of COVID-19 on the Company's programs and revenues" because they were "prepared with

13   a focus on the resources necessary to achieve long-term strategic goals rather than with a focus on

14   estimating the long-term value of the Company" (Rec. Stmt. at 47) was confusing and materially

15   misleading. As also conflictingly stated in the Recommendation Statement, the Long-Term

16   Projections *already* reflected the "significant uncertainty surrounding the impact of COVID-19 on

17   PALFORZIA and the uncertainties inherent in the Company's pipeline." *Id.* at 46. The Long-Term

18   Projections were presented to Nestlé and the Board ***after*** rigorous market research concerning the

19   impact of COVID-19 on the Company's revenues and so were reflective of these sensitivities.

20   However, with the Financial Advisors unable to find the merger fair utilizing the Long-Term

21   Projections, the Company decided to slash their projections on the poorly articulated basis that the

22   Long-Term Projections focused on achieving "long-term strategic goals" rather than estimating

23   "long-term value." *Id.* This is an arbitrary distinction, as, under sound corporate finance theory, the

24   value of a Company should be premised on the expected future cash flows of the corporation.

25   Accordingly, the Recommendation Statement misleading characterized the Long-Term Projections

26   in violation of Section 14(e) of the Exchange Act.

27

28

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

121.    Fourth, the Recommendation Statement omitted the market research conducted by Aimmune that indicated that demand for Palforzia as a treatment option had not diminished and had only reinforced managements' expectations for long-term revenue growth. Inclusion of this information was of obvious importance to stockholders, as it directly contradicted managements' decision to provide Lazard and J.P. Morgan with the newly-created, lower set of projections. The omission of this information created a materially misleading picture of the Company's future prospects.

122.    In sum, the omission of the above-referenced information renders the Recommendation Statement materially incomplete and misleading, in contravention of the Exchange Act.

## V.    The Inadequacy of the Offer Price

123.    It is estimated that over 30 million individuals in the US and Europe suffer from food allergy. Affecting more than 1.6 million children and adolescents in the U.S., the peanut allergy is the most common, and according to a study in 2017, its prevalence has risen 21% since 2010.[4]

124.    GlobalData Plc ("Global Data"), a data analytics and consulting company headquartered in London, England, estimates that the sales for peanut allergy therapies across eight leading markets could reach $4.5 billion by 2027, up from $2.6 million in 2017. With peanut allergy being a life-long condition, Palforzia can ensure long-term sales for Aimmune, which, according to Roth Capital Research, could reach $1 billion by 2026. Indeed, according to an 8-K filed with SEC on January 31, 2020, Palforzia will cost $890 a month per patient. Meanwhile, GlobalData forecasts the drug could rake in over $3 billion of sales to claim more than 67% of the peanut allergy market in 2027. This is all but confirmed in the developments following the Merger, as Palforzia received European approval on December 21, 2020.

125.    For these reasons, analysts who were intimately involved with the Company had price targets valuing the Company that completely dwarfed the Offer Price. Christopher Raymond of Piper

---

[4]    Gupta R, Warren C, Blumenstock J, et al. OR078 The Prevalence of Childhood Food Allergy in the United States: An Update. Ann Allergy Asthma Immunol. 2017;119(5 Suppl): S11.

Jaffray & Co. (now known as Piper Sandler Companies, previously defined as "Piper Sandler") maintained a $60.00 price target for Aimmune throughout the merger process, Lianna Moussatos of Wedbush Securities, Inc. ("Wedbush") maintained a $66.00 price target throughout the merger process, and Brian Skorney of Robert W. Baird & Co. ("Baird") maintained a $58.00 price target throughout the Merger process.

126. Piper Sandler is an American multinational independent investment bank and financial services company, focused on mergers and acquisitions, financial restructuring, public offerings, public finance, institutional brokerage, investment management and securities research. Christopher Raymond is a managing director and senior research analyst at Piper Sandler covering the biotechnology sector. Prior to joining Piper Sandler, he spent the previous 17 years covering biotechnology at Raymond James, Baird, and Prudential Vector Healthcare Group. Before that, he spent 10 years with Baxter Healthcare and G. D. Searle in various marketing, business development and strategy roles. Christopher Raymond received his bachelor's degree from Michigan State University and his Master of Business Administration degree from the University of Chicago Graduate School of Business. He currently serves on the board of the Financial Markets Institute at Michigan State's Broad College of Business.

127. Piper Sandler assumed coverage of Aimmune with a price target of $60.00 a share and maintained this price target throughout the merger process. Piper Sandler arrived at this valuation by 11x 2024E sales, discounted back by assuming end-user Palforzia revenue of $69M, $267M, and $594M for 2020-2022, respectively. Assuming moderate maintenance pricing of ~$5,000/year and just 6% US patient penetration, and 3% EU penetration by 2022. Piper Sandler derived its $60 price target by applying an 11x multiple on 2024 revenue estimate of $1,030M, discounted back by 20%/year. As shown below:

**Valuation Multiple of 2024E Revenue: Sensitivity Analysis**

|      | 9        | 10       | 11       | 12       | 13       | 14       |
|------|----------|----------|----------|----------|----------|----------|
| 10%  | $81.00   | $90.00   | $99.00   | $108.00  | $117.00  | $126.00  |
| 15%  | $62.73   | $69.70   | $76.67   | $83.64   | $90.61   | $97.58   |
| 20%  | $49.11   | $54.57   | $60.03   | $65.43   | $70.94   | $76.40   |
| 25%  | $38.84   | $43.15   | $47.47   | $51.79   | $56.10   | $60.42   |
| 30%  | $31.00   | $34.44   | $37.89   | $41.33   | $44.77   | $48.22   |

Source: Piper Jaffray

128.     Following the announcement of the Tender Offer, Christopher Raymond downgraded his price target noting that although Palforzia was stricken with slow uptake given widespread lockdowns around the Pandemic, but that once allergy clinics start running at full speed, Palforzia could make Nestlé's premium look like a steal in the long run, as Aimmune's stock "started 2020 right about at this level before the pandemic, and resultant shut-down of allergy clinics across the U.S. essentially killed the launch of Palforzia." Christopher Raymond stated, "while we understand the uncertainty that [the Pandemic] disruption presents, we also think as [P]andemic-related disruption recedes and Palforzia's true demand begins to manifest, it will be deemed that Nestlé got itself a bargain here."

129.     Wedbush is a privately held investment firm based in Los Angeles, California. As of February 2021, the firm had $2.4 billion under management with about 6,000 clients. Liana Moussatos joined Wedbush as a managing director and senior research analyst from Pacific Growth Equities, where she was a senior research analyst. Previously, she was director and portfolio manager of the UBS Global Biotech Funds for five years at UBS Global Asset Management. Liana Moussatos also was with Bristol-Meyers Squibb, where she was a manager in University and Government Licensing, External Science and Technology. Liana Moussatos received a bachelor's degree in entomology and a master's degree in zoology and biochemistry from Clemson University. She also earned a Ph.D. in plant pathology from the University of California, Davis, and completed a postdoctoral research fellowship in cellular and molecular physiology at the Yale School of Medicine. Liana Moussatos conducted the 2020 Wedbush PacGrow Healthcare Virtual Conference on August 12, 2020, where she interviewed Defendant Dallas.

130.     Wedbush maintained coverage of Aimmune with a price target of $66.00 a share throughout the Merger process. Wedbush forecasted that Palforzia could achieve close to $900 million in annual sales worldwide starting in 2023. As outlined below:

**AIMMUNE THERAPEUTICS (AIMT) Product Pipeline Valuation**

| Product | Indication | Eligible # Patients | Pricing $/Patient | Gross Sales '($000) | Year | Net Revs '($000) | Peak Penetration | Multiple | Est/Actual Launch | Discount Rate | Estimated Fair Value ($000) | Price Target per Share |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AR101 (WW) | Peanut Allergy (all ages) | 2,478,333 | $10,680 | $2,532,403 | 2025 | $1,899,302 | 15% | 10 | 3/15/2020 | 30% | $4,703,290 | $66.16 |
| AR101 (WW) | Peanut Allergy Ages 4-11 | 793,333 | $10,680 | $1,429,722 | 2025 | $1,072,292 | 28% | 10 | 3/15/2020 | 30% | $2,650,074 | $37.28 |
| AR101 (WW) | Peanut Allergy Ages 12-17 | 613,333 | $10,680 | $751,453 | 2025 | $563,589 | 22% | 10 | 3/15/2020 | 30% | $1,390,353 | $19.57 |
| AR101 (WW) | Peanut Allergy Ages 18-26 | 463,333 | $10,680 | $136,738 | 2025 | $102,553 | 5% | 9 | 1/15/2022 | 30% | $257,827 | $3.63 |
| AR101 (WW) | Peanut Allergy Ages 27-55 | 608,333 | $10,680 | $214,490 | 2026 | $160,868 | 6% | 9 | 1/15/2022 | 30% | $464,435 | $5.63 |
| AR201 (US) | Egg Allergy | 324,000 | $4,000 | $584,601 | 2032 | $496,910 | 40% | 3 | 6/30/2026 | 30% | $76,307 | $1.07 |

We use multiples to account for clinical and regulatory risk at various stages of development.

| | Stock | MidCap ($000) | Upside |
|---|---|---|---|
| 12-month Price Target | $66.16 | $4,703,290 | 186% |

| | | | |
|---|---|---|---|
| | | | 191% |
| Total Pipeline Value | $67.23 | $4,779,596 | |
| Plus One Year Est Cash | $4.03 | $286,197 | |
| Current Stock Price | $23.13 | $1,504,417 | |
| Current Sharecount (000) | 65,042 | | |
| 12 months Est Diluted Sharecount (000) | 71,088 | | |

t: in preclinical testing   6: in Phase 3
1: passed preclinical   7: Phase 3 data
2: IND filing/stage mature product   8: regulatory review
4: Phase 1 data   9: approved
5: Phase 2 data   10: launched

Source: Company data; Wedbush Securities, Inc. estimates

131.     Following the announcement of the Tender Offer, Liana Moussatos downgraded her price target stating that due to Nestlé's 25% stake, she did not foresee any competing bids. Liana Moussatos also noted that despite challenges from the Pandemic, Aimmune continued to make progress with payers regarding formulary adoption. Key upcoming catalysts for the Company included: 1) a decision from European regulators on Aimmune's MAA application for PALFORZIA™ in peanut allergy in Q4:20; 2) the submission of the IND for AIMab7195 in Q1:21; 3) top-line data for AR201/egg allergy Phase 2 data in H1:21; 4) a target action-date of mid-2021 for the Swissmedic review of PALFORZIA™; 5) top-line data from the Phase 3 POSEIDON trial evaluating PALFORZIA™ in children ages 1 to <4 years old with peanut allergy in H2:21.

132.     Baird is an American multinational independent investment bank and financial services company. Baird manages and oversees over $151 billion in client assets. Brian Skorney is a Baird senior analyst covering Biotechnology. Prior to joining Baird in 2012, he was a senior vice president in equity research at Brean Murray Carrett & Co, a vice president in equity research at ThinkEquity, LLC and a research analyst at Susquehanna International Group, LLC, all in the biotech/pharmaceutical industry. Brian Skorney received a BS in Biological Sciences from the University of Notre Dame and an MBA in Finance from New York University. On March 17, 2020, Brian Skorney downgraded his price target for Aimmune to $58.00 from $64.00 due to Pandemic headwinds. Brian Skorney stated that he was encouraged by the first patient dosing with commercial Palforzia and that management noted over 600 allergists have become REMS certified to prescribe

the therapy. Brian Skorney reiterated his Outperform rating on Aimmune shares.

133.    Aimmune's revenues, which had stagnated due to the slow launch of Palforzia attributable to the Pandemic, were set to drastically increase in the next quarter. As stated by Defendant Dallas on August 12, 2020:

    a.  As we think about this, we expect the vast majority of allergy practices to get through their patient backlogs in the course of the next month or two and then we really do expect to see them start to introduce more methodically Palforzia into their practices through the backend of the summer and into the fall... *See* Wedbush Conference at 12:24-12:43.

    b.  A lot of patients, and a lot of practices, tell us that they have a warehouse of patients, if you like, waiting to get onto to Palforzia therapy. So the demand is there, it is just about making certain that the practices are ready to treat these patients and that they got their catch-up work done. *See* Wedbush Conference at 12:50-13:05.

    c.  Allergists pretty much told us we're opening in June, it is going to take us 2 to 3 months to work through the backlog, we expect to start really ramping up on Palforzia, prescribing, sort of going into August and September. So the fact that we started seeing this happening in June and July is pretty encouraging. *See* Wedbush Conference at 14:00-14:15.

    d.  I'm very optimistic that as we get into the third quarter, we will see that number [the number of patients] pop quite nicely. *See* Wedbush Conference at 14:25-14:33.

134.    At the same time that revenues were expected to increase, European approval was imminent for Palforzia, with the CHMP positive opinion was released just two days following the completion of the Tender Offer. Moreover, the failure of DBV Technologies to obtain FDA Approval, as announced on August 4, 2020, was a boon for Aimmune in that the mammoth market for peanut allergies would be cornered for the Company for the next few years at the very least.

135.    In light of these catalysts and the significant upside potential for Aimmune, the all-cash offer of $34.50 per share by Nestlé was woefully inadequate despite the premium on the stock price. Indeed, based on the pre-Merger NTM price to sales ratio and the market cap at the time, even an approximate 1% of the U.S. peanut allergy market, equivalent to $170.9 million in sales, fetches a premium of ~371.2%, more than double that offered by Nestlé. With Aimmune's liquidity replenished after Nestlé's investment early in 2020, Aimmune could have afforded to wait for a better deal or

1    conduct a robust market check that would have likely resulted in superior offers for the Company.

2        136.    In light of the insufficiency of the Offer Price, it should not be surprising that one of

3    the Financial Advisors had a significant conflict of interest that was only disclosed as a footnote in

4    one of seven amendments to the Recommendation Statement: in the two years prior to the delivery

5    of Lazard's opinion on August 28, 2020, Lazard and its affiliates earned compensation in the amount

6    of approximately $13 million for investment banking services provided to L'Oréal S.A., an affiliate

7    of Nestlé. As a result, due to Lazard's significant business connections with Nestlé, Lazard had every

8    incentive to utilize the illegitimate Fairness Opinion Projections and render a favorable fairness

9    opinion or else lose a significant client and damage their business reputation.

10       **VI.    The Deficiencies in The Recommendation Statement Caused Plaintiffs' Losses
11           by Misleading Shareholders into Approving the Merger at An Inadequate Price**

12       137.    The misleading statements regarding the reliability of the Long-Term Projections and

13   more pessimistic Fairness Opinion Projections, in turn, caused shareholders to believe that the Tender

14   Offer was more attractive, relative to the Company remaining independent or conducting a robust

15   market check, than it truly was, and thus caused them to approve the Merger. The Fairness Opinion

16   Projections were more comparable to the Least Favorable Scenario of the Long-Term Projections,

17   which considered a 50% reduction in revenue across all of the Company's programs for all years. The

18   illegitimate Fairness Opinion Projections enabled the Financial Advisors to perform financial

19   analyses that implied the Offer Price of $34.50 per share was within the range of fairness, despite the

20   fact that just one-month earlier management had conducted market research that found that demand

21   for Palforzia as a treatment option had not diminished and had only reinforced managements

22   expectations for long-term revenue growth.

23       138.    The premium was significantly below the Company's pre-Pandemic trading price, as

24   its stock price was substantially depressed due to the staggered launch of Palforzia and the ongoing

25   Pandemic's affect on all equity markets. The premium was also significantly below a considerable

26   number of analysts' price targets on the Company.  Indeed, even throughout the worst weeks of the

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733

Pandemic and into the summer months as the nation began to recover, analysts maintained or even increased their price targets. Accordingly, the $34.50 premium was significantly below the $66.00 price target set by Wedbush, the $60.00 price target set by Piper Sandler, and the $58.00 price target set by Baird. Instead of remaining a standalone entity, management sold the Company at the very moment when revenues were expected to dramatically increase.

139.    Had the Financial Advisors used projections that were consistent with the Company's actual projection growth and expected revenues, they would not have been able to opine that the Tender Offer was fair, and even if they did so opine, stockholders would not have been convinced and would not have supported the Merger. It is for these reasons that stockholders have been economically harmed by the false Recommendation Statement and damages representing the difference between the fair value of the Company and the Offer Price are the appropriate remedy resulting from Defendants' violations of the Exchange Act.

## COUNT I

**Claim Against All Defendants for Violations of Section 14(e) of the Exchange Act**

140.    Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

141.    Defendants caused the Recommendation Statement to be issued with the intention of soliciting shareholders to tender their shares in the Tender Offer.

142.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

143.    Defendants violated this clause of Section 14(e) because they caused or allowed the Recommendation Statement to be disseminated to Aimmune shareholders in order to solicit them to tender their shares in the Tender Offer, and knew the Recommendation Statement contained untrue

statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

144.   Defendants misstated and/or omitted the material information identified above from the Recommendation Statement. While Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Tender Offer, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

145.   Aimmune is imputed with the knowledge of Defendant Dallas, who was a director, president, and chief executive officer of Aimmune.

146.   As a direct result of Defendants' preparation, review, and dissemination of the false and/or misleading Recommendation Statement, Plaintiffs and other Aimmune shareholders were impeded from making a decision on a fully informed basis and were induced to tender their shares and accept the inadequate Offer Price in connection with the Tender Offer. The false and/or misleading Recommendation Statement used to solicit the tendering of shares impeded Plaintiffs and other Aimmune shareholders from making a fully informed decision regarding the Tender Offer and was an essential link in consummating the Merger, which deprived them of full and fair value for their Aimmune shares. At all times relevant to the dissemination of the materially false and/or misleading Recommendation Statement, Defendants were aware of and/or had access to the true facts concerning the process involved in selling Aimmune, the projections for Aimmune, and Aimmune's true value, which was greater than the Offer Price Aimmune's shareholders will receive.

147.   The misrepresentations and omissions in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares in the Tender Offer. In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Recommendation Statement and in other information reasonably available to shareholders.

1

**<u>COUNT II</u>**

2

**Against Defendant Dallas for Violations of Section 20(a) of the Exchange Act**

3

148.    Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

4

149.    Defendant Dallas acted as a controlling person of Aimmune within the meaning of

5

Section 20(a) of the Exchange Act as alleged herein. By virtue of his position as an officer and director

6

of Aimmune and participation in and/or awareness of the Company's operations and/or intimate

7

knowledge of the false and misleading statements contained in the Recommendation Statement, he

8

had the power to influence and control and did influence and control, directly or indirectly, the

9

decision making of the Company, including the content and dissemination of the various statements

10

that Plaintiffs contend are false and/or misleading.

11

150.    Defendant Dallas was provided with or had unlimited access to copies of the

12

Recommendation Statement alleged by Plaintiffs to be misleading prior to and/or shortly after these

13

statements were issued and had the ability to prevent the issuance of the statements or cause them to

14

be corrected.

15

151.    In particular, Defendant Dallas had direct and supervisory involvement in the day-to-

16

day operations of the Company, and, therefore, is presumed to have had the power to control and

17

influence the particular transactions giving rise to the violations as alleged herein, and exercised the

18

same. Defendant Dallas as the President and Chief Executive Officer of the Company was directly

19

involved in the making of the Recommendation Statement

20

152.    By virtue of the foregoing, the Defendant Dallas violated Section 20(a) of the

21

Exchange Act.

22

153.    As set forth above, Defendant Dallas had the ability to exercise control over and did

23

control a person or persons who have each violated Section 14(e) of the Exchange Act, by their acts

24

and omissions as alleged herein. By virtue of his position as controlling persons, Defendant Dallas is

25

liable pursuant to Section 20(a) of the Exchange Act.

26

27

28

1

**RELIEF REQUESTED**

2      WHEREFORE, Plaintiffs pray for judgment and relief as follows:

3      A.      Declaring that this action is properly maintainable as a class action and certifying

4  Plaintiffs as Class Representatives and his counsel as Class Counsel;

5      B.      Awarding Plaintiffs and the Class damages sustained as a result of Defendants'

6  wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-

7  appraisal damages, plus pre-judgment and post-judgment interest;

8      C.      Awarding Plaintiffs and the Class the costs and disbursements of this action, including

9  reasonable attorneys' fees, expert fees, and expenses;

10     D.      Awarding extraordinary and/or equitable relief as permitted by law, equity, and the

11 federal statutory provisions sued hereunder; and

12     E.      Granting such other and further relief as this Court may deem just and proper.

13

**JURY DEMAND**

14     Plaintiffs demand a trial by jury.

15 DATED: September 30, 2021                    Respectfully submitted,

16 **MONTEVERDE & ASSOCIATES PC**              */s/ David E. Bower*
   Juan E. Monteverde                          David E. Bower
17 Miles D. Schreiner
   The Empire State Building                   David E. Bower SBN 119546
18 350 Fifth Avenue, Suite 4405                **MONTEVERDE & ASSOCIATES PC**
   New York, New York 10118                    600 Corporate Pointe, Suite 1170
19 Tel: (212) 971-1341                         Culver City, CA 90230
   Fax: (212) 202-7880                         Tel: (213) 446-6652
20 jmonteverde@monteverdelaw.com               Fax: (212) 202-7880
   mschreiner@monteverdelaw.com                dbower@monteverdelaw.com
21
   **KAHN SWICK & FOTI, LLC**                  *Counsel for Co-Lead Plaintiffs*
22 Michael Palestina
   Brian Mears
23 1100 Poydras Street, Suite 3200
   New Orleans, LA 70163
24 Telephone: (504) 455-1400
   Fax: (504) 455-1498
25 michael.palestina@ksfcounsel.com
   brian.mears@ksfcounsel.com
26
   *Counsel for Co-Lead Plaintiffs*
27

28

- 54 -

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934
CASE NO. 3:20-CV-06733