Juan E. Monteverde (admitted *pro hac vice*, NY Reg. No. 4467882)
MONTEVERDE & ASSOCIATES PC
The Empire State Building
350 Fifth Avenue, Suite 4740
New York, New York 10118
Tel: (212) 971-1341
jmonteverde@monteverdelaw.com

David E. Bower (SBN 119546)
MONTEVERDE & ASSOCIATES PC
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
dbower@monteverdelaw.com

*Counsel for Co-Lead Plaintiffs and Class Counsel*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE AIMMUNE THERAPEUTICS, INC. SECURITIES LITIGATION | Master File No. 3:20-CV-06733-MMC<br><br>**CO-LEAD PLAINTIFFS' NOTICE OF MOTION, MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing: July 18, 2025<br>Time: 9:00 a.m.<br>Court: Courtroom 7, 19th Floor<br>Judge: Hon. Maxine M. Chesney |

1

## TABLE OF CONTENTS

2  NOTICE OF MOTION ...............................................................................................1

3  STATEMENT OF ISSUES TO BE DECIDED ........................................................1

4  MEMORANDUM OF POINTS AND AUTHORITIES..............................................1

5  I.    INTRODUCTION...............................................................................................1

6  II.   HISTORY OF THE LITIGATION AND FACTUAL BACKGROUND ....................3

7  III.  THE SETTLEMENT WARRANTS FINAL APPROVAL ..........................................7

8          A.  The Standards for Final Approval......................................................................7

9          B.  The Proposed Settlement Satisfies Rule 23(e)(2)...........................................8

10             1.  Rule 23(e)(2)(A): Plaintiffs and Class Counsel Have Adequately
                   Represented the Class ........................................................................ 8

11

12             2.  Rule 23(e)(2)(B): The Proposed Settlement Was Negotiated at
                   Arm's Length After Mediation with an Experienced Mediator.............. 9

13             3.  Rule 23(e)(2)(C) (and *Hanlon* Factor 4): The Settlement Provides
                   Adequate – Indeed, Exceptional – Relief for the Class............................ 11

14

15                  a.  Rule 23(e)(2)(C)(i) (and *Hanlon* Factors 1, 2, and 3): The Costs,
                       Risks, and Delay of Trial and Appeal Strongly Support Approval .................. 13

16                  b.  Rule 23(e)(2)(C)(ii): The Proposed Method for Distributing
                       Relief Is Effective ........................................................................ 17

17

18                  c.  Rule 23(e)(2)(C)(iii): Attorneys' Fees.............................................................. 18

                    d.  Rule 23(e)(2)(C)(iv): Other Agreements........................................................ 19

19             4.  Rule 23(e)(2)(D): The Settlement Treats Class Members Equitably....................... 19

20

21          C.  The Ninth Circuit Factors and the Procedural Guidance Are Satisfied.....................20

22             1.  *Hanlon* Factors 1-4: the Strength of the Case vs. the Settlement ............................ 20

23             2.  *Hanlon* Factor 5: Discovery Completed and Stage of the Proceedings ................... 20

24             3.  *Hanlon* Factor 6: the Experience and Views of Class Counsel ............................... 21

25             4.  *Hanlon* Factor 7: No Other Case Affected or Government Participants .............. 22

26             5.  *Hanlon* Factor 8 and Final Approval Procedural Guidance 1:
                   the Positive Reaction of Class Members to the Settlement ..................................... 22

27  IV.   THE NOTICE SATISFIES DUE PROCESS........................................................ 22

28

- i -

**V.      THE PLAN OF ALLOCATION WARRANTS APPROVAL** ..................................... **22**

**VI.     THERE REMAINS NO DIFFERENCES BETWEEN THE CERTIFIED CLASS AND THE SETTLEMENT CLASS** .................................................................... **23**

**VII.    CONCLUSION** ..................................................................................................... **23**

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
Case No. 3:20-CV-06733-MMC

1

## TABLE OF AUTHORITIES

2

**CASES**                                                                    **Page(s)**

3
4
*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) .................................................................. 13-14

5
*Baum v. Harman Int'l Indus.*,
    575 F. Supp. 3d 289 (D. Conn. 2021) .................................................... 15

6
*Campbell v. Facebook, Inc.*,
    951 F.3d 1106 (9th Cir. 2020) ................................................................... 7

7
8
*Campbell v. Transgenomic, Inc.*,
    2020 U.S. Dist. LEXIS 97063 (D. Neb. June 3, 2020) ......................... 23

9
*Churchill Vill., L.L.C. v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ........................................................... *passim*

10
11
*Class Plaintiffs v. Seattle*,
    955 F.2d 1268 (9th Cir. 1992) ................................................................ 22

12
*De Leon v. Ricoh USA, Inc.*,
    No. 18-cv-03725-JSC, 2019 U.S. Dist. LEXIS 204442 (N.D. Cal. Nov. 25, 2019) ............. 10

13
*Facebook Biometric Info. Priv. Litig.*,
    2020 U.S. Dist. LEXIS 151269 ............................................................... 10

14
15
*Foster v. Adams & Associates, Inc.*,
    2022 U.S. Dist. LEXIS 25071 (N.D. Cal. Feb. 11, 2022) .................... 20

16
*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................................... 8

17
18
*Hefler v. Wells Fargo & Co.*,
    No. 16-cv-05479-JST, 2018 U.S. Dist. LEXIS 213045 (N.D. Cal. Dec. 17, 2018) ..... 9, 13, 18

19
*In re Extreme Networks, Inc. Sec. Litig.*,
    2019 U.S. Dist. LEXIS 121886 ...................................................... 15, 12, 19

20
21
*In re Omnivision Techs.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2007) .......................................... 12, 22

22
*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    2020 U.S. Dist. LEXIS 129939 ............................................................... 17

23
*Jiangchen v. Rentech, Inc.*,
    No. CV 17-1490-GW(FFMx), 2019 U.S. Dist. LEXIS 180474 (C.D. Cal. Oct. 10, 2019) ... 18

24
25
*Koeppen v. Carvana, LLC*,
    No. 21-cv-01951-TSH, 2024 U.S. Dist. LEXIS 150626 (N.D. Cal. Aug. 22, 2024) ............ 23

26
*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ..................................................................... 8

27

28

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
Case No. 3:20-CV-06733-MMC

*Mauss v. NuVasive, Inc.*,
   No. 13cv2005 JM (JLB), 2018 U.S. Dist. LEXIS 206387 (S.D. Cal. Dec. 5, 2018) ............. 13

*Medina v. NYC Harlem Foods Inc.*,
   No. 21-CV-1321 (VSB), 2022 U.S. Dist. LEXIS 73263 (S.D.N.Y. Apr. 21, 2022) .............. 19

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970) ................................................................................................. 15

*Moore v. Verizon Communs., Inc.*,
   No. C 09-1823 SBA, 2013 U.S. Dist. LEXIS 122901 ........................................... 10

*Nat'l Rural Telecomms. Coop. v. DIRECTTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) .......................................................................... 22

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ..................................................................... 7, 16, 17

*Scott v. ZST Digit. Networks, Inc.*,
   2013 U.S. Dist. LEXIS 197940 (C.D. Cal. 2013) ................................................ 13

*Va. Bankshares v. Sandberg*,
   501 U.S. 1083 (1991) ............................................................................................ 15

*Varjabidien v. Emulex*,
   888 F.3d 399 (9th Cir. 2018) ................................................................................ 21

*Vataj v. Johnson*,
   No. 19-cv-06996-HSG, 2021 U.S. Dist. LEXIS 75879 (N.D. Cal. Apr. 20, 2021) ......... 11, 12

Vinh *Nguyen v. Radient Pharms. Corp.*,
   2014 U.S. Dist. LEXIS 63312 (C.D. Cal. May 6, 2014) ...................................... 15

*Wong v. Arlo Techs.*,
   No. 5:19-cv-00372-BLF, 2021 U.S. Dist. LEXIS 58514 (N.D. Cal. Mar. 25, 2021) ............. 7

**STATUTES AND RULES**

28 U.S.C. § 1292 ............................................................................................... 4, 7

Fed. R. Civ. P. 23 .......................................................................................... *passim*

**OTHER AUTHORITIES**

Edward Flores and Svetlana Starykh, Recent Trends in Securities Class Action Litigation:   2024
Full-Year Review, NERA Economic Consulting, (Jan. 22, 2025) .......................................... 2, 12

L.T. Bulan, L.E. Simmons, Securities Class Action Settlements, 2022 Review and Analysis,
Cornerstone Research (2023) ...................................................................................... 12-13

1                                     **NOTICE OF MOTION**

2 **TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

3         PLEASE TAKE NOTICE that, on July 18, 2025, at 9:00 a.m., or as soon thereafter as counsel

4 may be heard before the Honorable Maxine M. Chesney, United States District Judge, at the United States

5 Courthouse, United States District Court, Northern District of California, 450 Golden Gate Ave., San

6 Francisco, California, Class Representatives Bruce Svitak and Cecelia Pemberton ("Class

7 Representatives" and, along with Co-Lead Plaintiff Barbara Svitak, "Plaintiffs")[1] and Class Counsel,

8 Monteverde & Associates PC ("M&A") and Kahn Swick & Foti, LLC ("KSF," and together, "Class

9 Counsel"), will and hereby do respectfully move the Court, pursuant to Federal Rule of Civil Procedure

10 23(e) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), for entry of an order granting

11 final approval of the proposed Settlement.

12         This Motion is supported by the following Memorandum of Points and Authorities, the

13 Declaration of Tina Chiango and the exhibits thereto ("Chiango Decl."), the previous filings in this case,

14 and such other and further representations as may be made by counsel at any hearing on this matter. A

15 proposed Final Judgment and Order of Dismissal with Prejudice is submitted herewith.

16                      **STATEMENT OF ISSUES TO BE DECIDED**

17         1.     Whether the Court should grant final approval of the Settlement.

18                      **MEMORANDUM OF POINTS AND AUTHORITIES**

19 **I.**    **INTRODUCTION**

20         The journey was not easy, but the destination was worth it. This case was filed during Covid

21 (September 2020) and settled more than four years later and just nine weeks before trial for $27.5 million.

22 Approval of that Settlement is warranted for at least three reasons.

23         <u>First</u>, more Class Members support this Settlement than supported the Merger itself. The claims

24 submitted by Class Members in the Settlement represent 43.8 million Aimmune shares – out of

25 approximately 46.5 million shares in the Class (which excludes Nestlé), **representing an exceptional**

26 _____

27 [1] All capitalized terms not defined herein have the same meanings as in the Stipulation of Settlement dated January 17, 2025 ("Stipulation"). ECF No. 244-1.

28

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
Case No. 3:20-cv-06733-MMC

**94% percent** **claim rate.** *See* Chiango Decl., ¶12. By contrast, only 43.44 million shares were tendered in favor of the Merger in the tender offer itself – representing 65% of Aimmune's common stock.[2] Moreover, **no objections or requests for exclusion** from Class Members have been received. Chiango Decl., ¶¶10-11.[3] These metrics indicate a strong settlement, and shareholders' collective voice is loud and clear: approve the Settlement and all relief requested.

   Second, the Settlement is an *exceptional* result. The $27.5 million Settlement, which provides for a $0.60 per share recovery, is (1) to the best of Class Counsel's knowledge, the only settlement of a Section 14 merger/acquisition action where the target company was subsequently written off as nearly worthless by the acquirer *during the pendency of the action*; (2) higher than many other comparable Section 14 merger/acquisition settlements (despite this write off)[4]; (3) nearly *two times* the median securities settlement in "standard" (*i.e.*, not "merger objection" cases) in 2024[5]; and (4) 13.7% - 28.9% of the theoretically available damages, which again exceeds the typical range of recoveries secured in securities class actions more generally.[6]

---

[2] *See* Schedule 13D, Aimmune Therapeutics, Inc. (Oct. 13, 2020), available at https://www.sec.gov/Archives/edgar/data/1631650/000119312520268119/d48870dsc13da.htm (last visited June 24, 2025).

[3] One request for exclusion from a former shareholder who was *not* a part of the class (he did not hold shares during the class period) was received. Chiango Decl., ¶10 & Ex. C. Because that shareholder was not a member of the class, his request is invalid.

[4] *See, e.g., Karri v. Oclaro, Inc., et al*., Case No. 3:18-03435 (N.D. Cal. 2024) ($15.25 million, $0.09 per share recovery); *In re Envision Healthcare Corp.*, No. 18-1068-RGA (D. Del.) ($17.4 million, $0.14 per share recovery); *NECA-IBEW Pension Trust Fund v. Precision Castparts Corp.*, No. 16-cv-01756-YY (D. Or. 2021) ($21 million, $0.16 per share recovery); *accord* ECF 255-1 (summary of recent comparable Section 14 class settlements).

[5] *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review*, NERA Economic Consulting, (Jan. 22, 2025), available at https://www.nera.com/content/dam/nera/publications/2025/PUB_2024_Full-Year_Sec_Trends_0122.pdf. The report notes that the median settlement value was $14 million in 2024, and that the inflation-adjusted median settlement value ranged from $9 million to $14 million in 2021-2023. *Id.* at 1, 23.

[6] *See* ECF 255 at ¶10 (Monteverde Decl. in Support of Motion for Attorneys' Fees and Expenses).

This result is all the more exceptional in light of the real risks that existed in this litigation,[7] including, but certainly not limited to, the facts that (1) the merger consideration *already* represented a *174% premium* over Aimmune's stock price prior to the Merger; (2) there were no higher offers on the table; (3) Nestle sold Aimmune's primary product at a substantial loss and essentially **wrote off the value of the acquisition while this case was pending**; and (4) an appeal of any judgment was almost certain in light of the history of the case and Defendants' early attempts to seek an interlocutory appeal. ECF 96, 110.  The Settlement is, simply put, an excellent result for the Class, especially when weighed against these risks.

      <u>Finally</u>, the Settlement was only reached after more than **four years** of litigation, at an advanced procedural stage, and as Plaintiffs and Class Counsel were preparing jury instructions to exchange with Defendants. The Settlement was reached just **nine weeks** before trial was set to start over a claim on which not a single case has gone to trial this century. To get here, Plaintiffs and Class Counsel successfully briefed and overcame multiple attempts by Defendants to dismiss the case, conducted exhaustive discovery (including 19 depositions), conducted a survey of class members, retained a damages expert, briefed summary judgment and *Daubert* motions, conducted a failed meditation, and were preparing for trial.[8] Only on the eve of the hearing on those dispositive motions did Plaintiffs and Class Counsel finally accept a mediator's proposal to settle the case.

      For these reasons, as discussed in greater depth below, the Settlement: is fair, reasonable, and adequate; meets all indicia of fairness; and merits the Court's final approval.

## II.    <u>HISTORY OF THE LITIGATION AND FACTUAL BACKGROUND</u>

      The initial complaint in this consolidated Action was filed on September 25, 2020. ECF 1. On December 14, 2020, Bruce and Barbara Carol Svitak and Cecilia Pemberton filed respective motions

---

[7] *See* ECF 162 (Defendants' Motion for Summary Judgment); 163 (Defendants' Motion to Exclude in Part, Expert Report and Testimony of William Jeffers).

[8] A full description of the work performed is discussed below and included in the Monteverde Decl. in Support of Motion for Attorneys' Fees and Expenses. *See* ECF 255.

for lead plaintiff. ECF 19, 20.[9] On February 22, 2021, this Court entered an Order appointing Bruce and Barbara Carol Svitak and Cecilia Pemberton as Co-Lead Plaintiffs and their counsel (M&A and KSF) as Co-Lead Counsel for the consolidated action. ECF 47.

On September 30, 2021, Plaintiffs filed their Amended Complaint, in which they alleged counts for violations of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 against Aimmune and its former CEO relating to the Recommendation Statement soliciting Aimmune shareholders to tender their shares in the Tender Offer. ECF 52. On November 23, 2021, Defendants filed a Motion to Dismiss the Amended Complaint. ECF 54. Plaintiffs filed their opposition to Defendants' motion on January 11, 2022, Defendants filed their reply on February 15, 2022, and Plaintiffs filed a sur-reply on March 12, 2022. ECF 59, 62, 68. A hearing was held before the Court on April 29, 2022, after which the Court entered an Order Denying Defendants' Motion to Dismiss the Amended Complaint. ECF 71, 72.

On May 20, 2022, Defendants filed their Answer and Affirmative Defenses to the Amended Complaint. ECF 76. On August 31, 2022, Defendants filed a Rule 12(c) Motion for Judgment on the Pleadings, asserting that Plaintiffs lacked a private right of action under Section 14(e). ECF 85. Plaintiffs filed their opposition on September 23, 2022, and Defendants filed their reply on October 10, 2022. ECF Nos. 88, 91. After a hearing before the Court, on November 18, 2022, the Court entered an Order Denying Defendants' Rule 12(c) Motion for Judgment on the Pleadings. ECF 96.

On December 22, 2022, Defendants filed a Motion to Certify for an Interlocutory Appeal the Court's November 18, 2022 Order Under 28 U.S.C. § 1292(b). ECF 98. Plaintiffs opposed Defendants' Motion on January 25, 2023, and Defendants filed their reply on February 3, 2023. ECF Nos. 106, 107. Following a hearing on February 24, 2023, the Court entered an Order denying the motion. ECF 110.

---

[9] Prior to filing her motion for lead plaintiff, Ms. Pemberton had also sought and received books and records from Aimmune regarding the Merger under Delaware law (8 Del. C. § 220) in the action captioned *Pemberton v. Aimmune Therapeutics, Inc.*, C.A. No. 2020-0859-JRS (Del. Ch.).

On June 23, 2023, the Court entered an Amended Pretrial Preparation Order. ECF 125. Thereafter, the parties engaged in extensive discovery. During the course of the action, Defendants and third parties produced and Class Counsel reviewed more than 313,000 pages of discovery documents, including e-mails, board materials, financial data and projections, analyst reports, and other Merger-related documentation. ECF 255 at ¶4. The parties conducted 19 fact and expert witness depositions. *Id*. All three Plaintiffs sat for depositions and produced documents to Defendants. *Id*. Plaintiffs also prepared and mailed surveys to approximately 2,104 potential Class Members regarding the importance of the facts at issue in the case to the average reasonable investor. *Id*. In addition, the parties engaged respective experts. Plaintiffs retained William Jeffers, CFA of the Griffing Group, and Defendants engaged Professor Paul A. Gompers, Ph.D., of the Harvard Business School. *Id*. Both experts filed extensive opening and responsive reports, and both experts were deposed. *Id*.

On December 8, 2023, the Court entered a stipulated Second Revised Scheduling Order extending certain deadlines. ECF 131. On March 8, 2024, Plaintiffs filed a Motion for Class Certification, and a hearing before the Court was scheduled for June 28, 2024. ECF 134. Defendants filed their response in opposition on April 22, 2024, and Plaintiffs filed their reply on May 21, 2024. ECF 141, 142. On May 24, 2024, the Court entered an Order Granting Co-Lead Plaintiffs' Motion for Class Certification (the "Class Certification Order"). ECF 143. Pursuant to the Class Certification Order, Co-Lead Plaintiffs Bruce Svitak and Cecilia Pemberton were appointed as Class Representatives[10] and M&A and KSF were appointed as Class Counsel. *Id*. The Court certified a Class defined as (*id.*):

> All record holders and all beneficial holders of Aimmune Therapeutics, Inc. ("Aimmune" or the "Company") common stock who held such stock at any time during the pendency of the tender offer involving Aimmune and Société des Produits Nestlé S.A. ("Nestle") (from September 14, 2020 through October 9, 2020) and had their shares exchanged for $34.50 per share in connection with the closing of the merger (on October 13, 2020) (the "Class"). Excluded from the Class are: (i) Nestle and its affiliates; (ii) the officers and directors of the Company and members of their immediate families; (iii) any entity in which Defendants have

---

[10] Co-Lead Plaintiff Barbara Carol Svitak did not seek appointment as a Class Representative.

1   or had a controlling interest; and (iv) the legal representatives, heirs, successors or assigns of
    each officer and director of the Company.

2       On June 14, 2024, Class Representatives filed a Motion for Partial Summary Judgment and a

3   *Daubert* Motion to Limit Testimony of Paul A. Gompers, and Defendants filed a Motion for

4   Summary Judgment and a Motion to Exclude, in Part, Expert Report and Testimony of William

5   Jeffers. ECF 153, 158, 162, 163. The Parties filed their respective oppositions on August 5 and August

6   9, 2024, and their replies on September 19, 2024. ECF 194, 195, 198, 199, 210, 212, 214, 215. All of

7   the motions were scheduled for hearing on November 1, 2024.

8       On September 24, 2024, the Parties participated in a mediation before David M. Murphy of

9   Phillips ADR Enterprises, P.C. ECF 255 at ¶5. By the time the Parties participated in the mediation,

10  fact and expert discovery was complete, and all Parties had fully briefed and opposed motions for

11  summary judgment and *Daubert* motions. *Id*. While the Parties were not able to reach a settlement at

12  the mediation, the Parties continued their discussions with the assistance of Mr. Murphy. *Id*. On

13  October 31, 2024, at the request of the parties, the hearing on the summary judgment and *Daubert*

14  motions was rescheduled to November 8, 2024, to allow the Parties to continue settlement

15  negotiations. ECF 237.

16      On November 7, 2024, one day before the hearing on dispositive motions, and after further

17  negotiations, the Parties accepted a mediator's proposal and reached an agreement in principle to

18  resolve the Litigation, subject to Court approval. ECF 255 at ¶5. Later that day, the parties filed a

19  Notice of Settlement with the Court, after which the Court vacated all remaining deadlines, hearings,

20  and trial dates. ECF 238, 239. Thereafter, the Settling Parties memorialized the terms of the

21  Settlement in the Stipulation. ECF 244-1.

22      Plaintiffs moved for preliminary approval of the Settlement on January 17, 2025. ECF 243.

23  After a hearing on February 28, 2025, the Court entered an Order Preliminarily Approving Settlement

24  and Providing for Notice. ECF 251. Pursuant to the Preliminary Approval Order, the Claims

25  Administrator mailed the Notice by the Notice Date to all record holders and beneficial holders of

26  Aimmune stockholders who purchased, sold, or held Aimmune shares at any time during the

27  Settlement Class Period and also posted the Notice on the settlement website at

28

1   www.rg2claims.com/aimmune.html. Chiango Decl., ¶¶4-5, 9. In addition, Summary Notice was

2   posted via *PRNewswire*. *Id*. at ¶6. Moreover, all notices and briefs related to the Settlement were

3   posted on the Claims Administrator's website.

## III.   THE SETTLEMENT WARRANTS FINAL APPROVAL

### A.   THE STANDARDS FOR FINAL APPROVAL

6        In the Ninth Circuit, there is a "'strong judicial policy that favors settlements, particularly where

7   complex class action litigation is concerned.'" *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir.

8   2020) (quoting *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556, 568 (9th Cir. 2019)). The Court

9   need not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits

10  of the dispute[.]" *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009). Rather, it must "reach

11  a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion

12  between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and

13  adequate to all concerned." *Id*. at 965.

14       There are three sources of rules governing final approval of class action settlements in this

15  District. First, Rule 23(e) of the Federal Rules of Civil Procedure applies. Pursuant to Rule 23(e), "the

16  court may [finally] approve [a proposed settlement] only after a hearing and only on finding that it is fair,

17  reasonable and adequate." Fed. R. Civ. P. 23(e)(2). To determine whether a settlement is "fair, reasonable,

18  and adequate" under Rule 23(e), the Court must consider whether:

19       (A) the class representatives and class counsel have adequately represented the class; (B) the
20       proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking
         into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed
21       method of distributing relief to the class, including the method of processing class-member
         claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; (vi)
22       and any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class
         members equitably relative to each other. *Id.*

23       These Rule 23(e) factors are not intended to fully displace factors previously adopted by

24  courts to evaluate settlements. *See, e.g., Wong v. Arlo Techs.*, No. 5:19-cv-00372-BLF, 2021 U.S.

25  Dist. LEXIS 58514, at *19 (N.D. Cal. Mar. 25, 2021) ("[T]he Court applies the framework set forth

26  in Rule 23 with guidance from the Ninth Circuit's precedent."). Rather, and second, the Ninth Circuit

27  has long considered the following additional factors when evaluating a class settlement (the "*Hanlon*

28

---

7

Factors"), some of which overlap with Rule 23(e)(2): (1) the strength of plaintiffs' case; (2) the risk,
expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action
status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed
and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a
governmental participant; and (8) the reaction of Settlement Class members. *Hanlon v. Chrysler
Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998); *see also Lane v. Facebook*, Inc., 696 F.3d 811, 819 (9th
Cir. 2012) (discussing the *Hanlon* factors); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th
Cir. 2004) (same). Finally, and <u>third</u>, the Northern District of California provides practitioners with
procedural guidance for the approval of class action settlements ("Procedural Guidance"), only one
of which (the class members' response) is relevant at final approval, and which overlaps with *Hanlon*
factor (8).[11]

In light of this overlap, Plaintiffs first address the requirements of Rule 23(e) and any
overlapping Ninth Circuit *Hanlon* factors as part of that Rule 23(e) analysis (*infra* §III.B), then
address the remaining non-overlapping *Hanlon* Factors and Procedural Guidance (*infra* §III.C). As
discussed, the proposed Settlement easily satisfies each of the factors outlined in Rule 23(e)(2),
*Hanlon*, and this Court's Procedural Guidance, and final approval should therefore be granted.

### B.    THE PROPOSED SETTLEMENT SATISFIES RULE 23(e)(2)

#### 1.    Rule 23(e)(2)(A): Plaintiffs and Class Counsel Have Adequately Represented the Class

Plaintiffs and Class Counsel have diligently represented the Class as required by Rule 23(e)(2)(A).
Class Counsel are highly qualified and experienced in securities litigation (*see* M&A and KSF firm
resumes, ECF 255-2 and 255-3) and zealously prosecuted this Action on behalf of Plaintiffs and the
Settlement Class. The proposed Settlement in this Section 14 merger litigation – which involved
considerable challenges to proving liability and damages – would not have been possible but for Class

---

[11] https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/.    The
remaining two Final Approval Procedural Guidance factors (attorneys' fees and service awards) are
addressed in Plaintiff's previously filed Motion for Attorneys' Fees. ECF 254.

Counsel's perseverance and sound advocacy for the Settlement Class. Class Counsel successfully opposed a 12(b)(6) motion to dismiss and a Rule 12(c) motion for judgment on the pleadings; obtained class certification; conducted extensive fact and expert discovery; fully briefed cross-motions for summary judgment and cross-motions to limit experts; participated in a formal mediation process with an experience mediator; and devoted thousands of hours to prosecuting the action by the time the Parties settled. *Cf. Hefler v. Wells Fargo & Co.,* No. 16-cv-05479-JST, 2018 U.S. Dist. LEXIS 213045, at *18 (N.D. Cal. Dec. 17, 2018) (Rule 23(e)(2)(A) satisfied where "Class Counsel had vigorously prosecuted this action through dispositive motion practice, extensive…discovery, and formal mediation"). Additionally, all three Plaintiffs sat for depositions, produced documents to Defendants, and had ongoing discussions with Class Counsel throughout the litigation regarding significant filings, litigation strategy, and potential settlement. *See* ECF 255 (Monteverde Decl.) at ¶4; ECF 255-4, 255-5, 255-6 (Plaintiffs' Declarations).

Plaintiffs' and Class Counsel's commitment to obtaining the best possible result for the Settlement Class is evinced by the adversarial history of this litigation discussed above and the considerable time and resources devoted to prosecuting this Action, which enabled them to negotiate a strong Settlement for the Settlement Class. The extensive four-year history of this litigation should leave no doubt that Plaintiffs and Class Counsel have zealously advocated for the Class.

Moreover, Plaintiffs and Class Counsel have no interests antagonistic to those of the Settlement Class Members, as the claims of Plaintiffs and the Settlement Class Members arise from the same alleged conduct and Plaintiffs share the common interest in obtaining the largest possible recovery for the Settlement Class. Indeed, this Court already determined on a preliminary basis that Plaintiffs and Class Counsel adequately represented the Class. ECF 251. The facts supporting that finding have not changed, and this factor supports final approval.

### 2. Rule 23(e)(2)(B): The Proposed Settlement Was Negotiated at Arm's Length After Mediation with an Experienced Mediator

The Settlement bears the hallmark signs of a diligently contested arm's length compromise. First and foremost, the proposed Settlement is the "product of serious, informed, and noncollusive [sic]

negotiations" between the parties after extensive litigation and discovery, certification of the Class, fully briefed motions for summary judgment and *Daubert* motions, and a fulsome mediation process before an experienced mediator that resulted in a mediator's recommendation. *Cf. Facebook Biometric Info. Priv. Litig.*, 2020 U.S. Dist. LEXIS 151269, at *10-11 (settlement deemed "product of serious, informed and noncollusive negotiations" when achieved after formal mediation and "considerable time and effort by the mediator and the parties"). As noted, the Parties participated in a full-day, in-person mediation before David Murphy[12] on September 24, 2024, and thereafter participated in various teleconferences and correspondences with Mr. Murphy for the following six weeks before coming to a settlement in principle on November 7, 2024, just *one day* before the dispositive motions hearing in this matter was scheduled for oral argument, and as a result of an October 30, 2024 double-blind mediator's proposal. ECF 255 at ¶5. Through this process, the strengths and weaknesses of the Parties' claims and defenses were extensively debated; negotiations were hard-fought; and Plaintiffs and Class Counsel were thus well-positioned to evaluate the strengths and weaknesses of the claims and defenses, as well as the fairness of the Settlement. *Id*. at ¶6. There are thus absolutely no signs of collusion.

This process and the participation of an independent mediator weigh heavily in favor of a finding that the Settlement is not collusive. *See De Leon v. Ricoh USA, Inc.*, No. 18-cv-03725-JSC, 2019 U.S. Dist. LEXIS 204442, at *29 (N.D. Cal. Nov. 25, 2019) ("The use of an experienced private mediator and presence of discovery supports the conclusion that Plaintiff [was] armed with sufficient information about the case to broker a fair settlement."); *Moore v. Verizon Communs., Inc.*, No. C 09-1823 SBA, 2013 U.S. Dist. LEXIS 122901, *32 (N.D. Cal. Aug. 28, 2013) (participation of a mediator is "a factor weighing in favor of a finding of non-collusiveness.") (citing *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 938).

---

[12] David Murphy is an experienced mediator that regularly mediates federal class action securities cases, shareholder derivative suits, and breach of fiduciary duty and corporate control cases. Philips ADR, David Murphy, Esq., https://phillipsadr.com/our-team/david-m-murphy/ (last visited June 24, 2025).

**3.    Rule 23(e)(2)(C) (and *Hanlon* Factor 4): The Settlement Provides Adequate – Indeed, Exceptional – Relief for the Class**

Pursuant to Rule 23(e)(2)(C), the Court considers whether "the relief provided for the class is adequate, taking into account (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."[13] *Hanlon* Factor Four likewise assesses the amount offered in settlement. *Churchill*, 361 F.3d at 575.

When evaluating the adequacy of a settlement, courts balance a plaintiff's expected recovery against the value of the offer. *See Vataj v. Johnson*, No. 19-cv-06996-HSG, 2021 U.S. Dist. LEXIS 75879, at *26 (N.D. Cal. Apr. 20, 2021). Here, both the aggregate Settlement Amount of $27.5 million and the per share settlement amount – $0.60 for shares that were valued at $34.50 in the Merger[14] – exceed or are squarely in line with other Section 14 settlements, which raise unique challenges that do not exist in more traditional securities fraud actions under Section 10(b)/Rule 10b-5. These metrics are nearly equivalent to or exceed all five analogous Section 14 "merger projection challenge" case settlements previously identified by Class Counsel in (a) total amount, (b) per share recovery, and (c) per share recovery measured against the company's share price at the time of the Merger:[15]

---

[13] Each of these four factors are addressed separately below.
[14] Assuming all shares in the Class submit a valid and timely Proof of Claim, the average distribution will be $0.60 per share (before the payment of Court-approved fees and expenses (estimated to be approximately $0.20 per share) and the cost of notice and claims administration). ECF 255 at ¶10.
[15] *Ziegler v. GW Pharmaceuticals plc,* Case No. 3:21-cv-01019-BAS-MSB (S.D. Cal. 2024); *Karri v. Oclaro, Inc., et al.*, Case No. 3:18-03435 (N.D. Cal. 2024); *Baum v. Harman Int'l Indus. Inc.*, No. 3:17-cv-00246-RNC (D. Conn. 2022); *In re Envision Healthcare Corp.*, No. 18-1068-RGA (D. Del. 2021); *NECA-IBEW Pension Trust Fund v. Precision Castparts Corp.*, No. 16-cv-01756-YY (D. Or. 2021).

| Case Name | Ziegler v. GW Pharmaceuticals | Karri v. Oclaro | Baum v. Harman Int'l | In re Envision Healthcare Corp. | NECA-IBEW v. Precision Castparts | Aimmune |
|---|---|---|---|---|---|---|
| Common Fund Amount | $7.75m | $15.25m | $28m | $17.4m | $21m | $27.5m |
| Number of Shares Held by Class | 396m | 167.5m | 69m | 120m | 133m | 46m |
| Market Cap / Price Per Share | $6.81b / $220 p/ADS | $1.8b / $8.62 p/s | $5.5b / $111.50 p/s | $9.9b / $46 p/s | $37b / $235 p/s | $2.5b / $34.50 p/s |
| Average Recovery Per Share | $0.25 | $0.09 | $0.40 | $0.14 | $0.16 | $0.60 |

The proposed Settlement Fund also represents (1) 28.9% of damages based on Aimmune's 52-week high share price (which represented an aggregate plausible damages amount of $95 million) and (2) 13.7% of the maximum theoretical aggregate damages of $201.2 million calculated by Plaintiffs' expert, assuming they prevailed on *all* claims against Defendants, which again exceeds the typical range of recoveries secured in comparable securities class actions more generally. *See* ECF 255 at ¶10; *Ziegler v. GW Pharmaceuticals plc,* Case No. 3:21-cv-01019-BAS-MSB (S.D. Cal. 2024) (ECF 47-1 and 53) (approving settlement that recovered 1.3% of maximum available damages); *Ferraro Family Foundation, Inc., et al. v. Corcept Therapeutics Inc., et al.,* Case No. 3:19-cv-01372-JD (N.D. Cal. 2023) (ECF 195 and 215) (approving settlement that recovered 7.3% of maximum available damages); *Vataj,* 2021 U.S. Dist. LEXIS 75879, at *26 (preliminarily approving settlement that recovered 2% of estimated damages); *In re Extreme Networks, Inc. Sec. Litig.,* 2019 U.S. Dist. LEXIS 121886, at *27 (approving settlement that recovered 5%-9.5% of estimated maximum non-disaggregated damages).[16]

---

[16] *See also In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2007) (noting that a recovery of 9% of possible damages was "more than triple the average recovery in securities class action settlements"); *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review*, at 27 (*supra* note 2) (median ratio of settlement to losses was 1.2% in 2024 and 1.8% from 2021-2023); L.T.

1    Accordingly, this critical factor weighs heavily, if not decisively, in favor of approval.

2    　　　　a.    **Rule 23(e)(2)(C)(i) (and *Hanlon* Factors 1, 2, and 3): The Costs, Risks, and Delay of Trial and Appeal Strongly Support Approval**

3    Pursuant to Rule 23(e)(2)(C)(i), in determining the adequacy of a proposed settlement, the

4    Court must also weigh the settlement amount against "the costs, risks, and delay of trial and appeal."

5    Relatedly, the overlapping *Hanlon* Factors 1-3 assess "the strength of the plaintiffs' case," "the risk,

6    expense, complexity and likely duration of further litigation," and "the risk of maintaining class action

7    status throughout the trial." *Churchill*, 361 F.3d at 575. While, as outlined in the previous section, the

8    proposed Settlement amount *itself*, standing alone, is evidence of its adequacy, its adequacy is even

9    more apparent when that amount is compared to the *significant* risks and uncertainty that Plaintiffs

10    and Class Counsel faced in bringing this case to trial.

11    Section 14 merger cases seeking damages (as opposed to pre-close injunctive relief) are few

12    and far between, and no such case has gone to trial this century. The dearth of post-close Section 14

13    merger litigation has led to a limited and inconsistent body of law and significant uncertainty. And

14    the PSLRA provides well-known significant protections to defendants that make it much harder for

15    plaintiffs to recover damages. As a result of these facts, these cases face unique hurdles, and numerous

16    courts have recognized that "'securities actions are highly complex and…securities class litigation is

17    notably difficult and notoriously uncertain.'" *Hefler,* 2018 U.S. Dist. LEXIS 213045, at *37; *see also*

18    *Mauss v. NuVasive, Inc*., No. 13cv2005 JM (JLB), 2018 U.S. Dist. LEXIS 206387, at *15-16 (S.D.

19    Cal. Dec. 5, 2018) (recognizing that "[s]ecurities class actions are complex actions to litigate" and

20    often involve "complex and highly risky trial and likely post-trial appeals and motion practice"); *Scott*

21    *v. ZST Digit. Networks, Inc.*, 2013 U.S. Dist. LEXIS 197940, at *11 (C.D. Cal. 2013) ("[C]ases

22    brought under the [PSLRA]…involve a 'heightened level of risk' because PSLRA 'makes it more

23    difficult for investors to successfully prosecute securities class actions.'"); *Alaska Elec. Pension Fund*

24    

25    Bulan, L.E. Simmons, *Securities Class Action Settlements, 2022 Review and Analysis*, Cornerstone

26    Research (2023), at 6 (stating that the median comparable securities class action settlements in 2022

27    resulted in a recovery of 4.3% or 4.4% of estimated damages), https://www.cornerstone.com/wp-content/uploads/2023/03/Securities-Class-Action-Settlements-2022-Review-and-Analysis.pdf.

28

1   *v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) ("[T]o be successful, a securities class-action

2   plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree

3   and congressional action.").

4          Plaintiffs and Class Counsel faced significant risks moving forward with this litigation in

5   particular. While Class Counsel remained confident in their ability to prove their claims at trial,

6   Defendants advanced several credible arguments regarding both liability and damages. For example,

7   Defendants argued that the Recommendation Statement was not false and misleading because it

8   informed stockholders that the Company's projections had been reduced and included the impact of

9   the maintenance duration assumption on the share price in documents made available to investors

10  with the original Recommendation Statement, as well as in an amendment to the Recommendation

11  Statement. *See* ECF 162, at 10-16 (Defendants' Motion for Summary Judgment). They likewise

12  argued that, because Palforzia had not reached commercialization at the time of the Merger, the

13  maintenance duration assumption was necessarily an uncertain extrapolation made from a small

14  number of clinical trials, and that Plaintiffs had not adduced evidence that Defendants intended to

15  deceive investors regarding this assumption. *Id.* Defendants also argued that Plaintiffs could not

16  support their claim that Aimmune's CEO intentionally manipulated the projections, as he had every

17  incentive to maximize his own proceeds in the Merger. *Id.* at 18-19. Simply put, establishing

18  Defendants' liability at summary judgment or trial would be difficult and complex, with success far

19  from certain. ECF 255 at ¶7.

20         Even more concerning were Defendants' arguments regarding, and Plaintiffs' unique hurdle

21  to proving, economic loss in a Section 14 case such as this. Even if Plaintiffs prevailed on liability, loss

22  causation presented challenges in this case that far exceed the obstacles facing plaintiffs in more

23  frequently litigated Rule 10b-5 cases, which seek losses incurred during a stock price drop, as

24  shareholders here received a *premium* over the stock's trading price in a merger after a sales process

25  during which the corporation's value was vetted by third parties. Defendants had numerous

26  challenges to loss causation and damages, including the fact that Aimmune stockholders received a

27  174% premium for their Aimmune shares through the Merger, and that there was no higher offer on

28

the table. ECF 162 at 20-22; 163; ECF 255 at ¶8. Although Plaintiffs believe their loss causation theory is valid under Supreme Court precedent,[17] several lower court opinions have found that, when shareholders receive a premium over the trading price, it forecloses a finding of economic loss, because the merger consideration is "greater than the market value or actual value of the shares without consideration of the merger due to the existence of a merger premium." *See, e.g., In re Resolute Energy Corp. Sec. Litig.*, No. 19-77-RGA, 2021 U.S. Dist. LEXIS 19193, at *5, *10 (D. Del. Feb. 1, 2021) (citing five other opinions in support of proposition). Indeed, based in part on these facts and law, in a motion pending before the Court at the time of the Settlement, Defendants sought to exclude vast swaths of Plaintiffs' valuation expert's opinions that, if granted, may have singlehandedly rendered it impossible for Plaintiffs to prove damages at trial. ECF 163; ECF 255 at ¶8.

Perhaps most challenging of all, though, was Defendants' argument that Nestlé had sold Aimmune's primary product at a substantial loss and **essentially written off the value of the acquisition <u>while this case was pending</u>**. ECF 255 at ¶8. Had that fact made its way before the jury, the jury may well have found that Plaintiffs and the Class not only suffered no loss at all, but that Nestlé in fact overpaid for Aimmune to begin with. Simply put, "in 'any securities litigation case, it [is] difficult for [plaintiff] to prove loss causation and damages at trial.'" *In re Zynga Sec. Litig.,* No. 12-cv-04007-JSC, 2015 U.S. Dist. LEXIS 145728, at *35 (N.D. Cal. Oct. 27, 2015).[18] That is all the more true in this case because of its *unique* economic loss issue, where the target company was essentially written off *while this case was pending*. *Accord* ECF 253, Preliminary Approval Transcript, at 6 ("the case has a lot of hurdles to get over") and 10 (noting "a lot of factual hurdles

---

[17] *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 389 (1970); *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1100 (1991); *see also Baum v. Harman Int'l Indus*., 575 F. Supp. 3d 289, 299 (D. Conn. 2021).

[18] *See also Vinh Nguyen v. Radient Pharms. Corp.*, 2014 U.S. Dist. LEXIS 63312, at *6 (C.D. Cal. May 6, 2014) (noting that, in securities class actions, "[p]roving and calculating damages required a complex analysis, requiring the jury to parse divergent positions of expert witnesses in a complex area of the law.  The outcome of that analysis is inherently difficult to predict and risky."); *In re Extreme Networks, Inc. Sec. Litig.*, 2019 U.S. Dist. LEXIS 121886, at *24-*25 (noting that "[s]ecurities actions, in particular are often long, hard-fought, complicated, and extremely difficult to win," facing "obstacles includ[ing] challenges to the material falsity of each alleged misstatement, class certification challenges, loss causation and damages challenges, and the risks inherent in a 'battle of the experts' of complex economic theories in a jury trial.").

1  and defenses the Defendant was prepared to raise here" and stating: "I think the sum of money being

2  offered appears to be fair, in light of that. It's not an insignificant amount of money.").

3      Barring the Settlement, Plaintiffs and Class Counsel faced the very real prospect of prevailing

4  in proving liability (which presented its own challenges), only to have the Class receive nothing if

5  the Court or a jury agreed with Defendants and their experts regarding loss causation/damages.  In

6  other words, there was simply no guarantee that any additional benefit would be provided to the Class,

7  and a very real risk that the Class would receive less than the Settlement Amount – *or nothing at*

8  *all*.[19] As noted, at the time the Settlement was reached, Defendants' motion for summary judgment

9  sought dismissal of *all* claims. Plaintiffs and Class Counsel were not alone in their concerns: the

10  mediator recognized them and made his mediator's recommendation with them in mind. ECF 255 at

11  ¶¶5-6.

12      What is more, while the Class had already been certified by the Court, Rule 23(c)(1) provides

13  that a class certification order may be altered or amended at any time prior to a decision on the merits,

14  such that there was an ongoing risk that any certified class could have been disturbed on appeal or if

15  Defendants successfully moved to decertify the Class. *See Rodriguez*, 563 F.3d at 966. Finally, as

16  noted, the risk of appeal was greater here than in other cases. As the Court may recall, after this action

17  survived Defendants' initial motion to dismiss based in part on a recent Ninth Circuit holding that

18  differentiated between actions based on negligence and fraud, Defendants filed a Rule 12(c) motion in

19  which they cited that same Ninth Circuit opinion for the proposition that it invalidated the private right of

20  action under Section 14(e). ECF 85. Although this Court disagreed, Defendants then sought leave to

21  challenge that ruling and the private right of action in general via interlocutory appeal. ECF 96, 110. Even

22  if Plaintiffs prevailed at a trial, it is virtually certain that Defendants would have tried for a third time to

23  contest the private right of action through appeal – and likely to the Supreme Court – a process that

24

25  [19] Indeed, from 1996 to 2018, only 25 securities class actions (*of any kind*) went to a verdict and of

26  those 25, only 13 resulted in a verdict for plaintiffs. Kevin LaCroix, THE D&O DIARY, *Rare Securities*
   *Class Action Lawsuit Trial Results in Partial Verdict for Plaintiffs* (Feb. 5, 2019),

27  https://www.dandodiary.com/2019/02/articles/securities-litigation/rare-securities-class-action-
   lawsuit-trial-results-partial-verdict-plaintiffs/.

28

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT
Case No. 3:20-cv-06733-MMC

would further extend the litigation for years and risked reversal of any verdict. *Accord* ECF 253, Preliminary Approval Transcript, at 10 (noting risk of appeal and time associated therewith).

Conversely, the Settlement confers a substantial and immediate benefit and avoids the risks associated with obtaining a wholly speculative (though potentially larger) sum in the future. *Id. In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 U.S. Dist. LEXIS 129939, at \*46 (N.D. Cal. July 22, 2020) ("By contrast, the Settlement provides the Settlement Class with timely and certain recovery"). And Plaintiffs could not have taken this matter much closer to the precipice: the parties did not agree to a settlement in principle until just *one day* before the dispositive motion hearing, and only then after a double-blind mediator's proposal. The Settlement is, simply put, a testament to Plaintiffs' and Class Counsel's dogged determination in the face of significant obstacles to recovery. For these reasons, this critical factor weighs heavily in favor of final approval of the Settlement. *Accord* ECF 253, Preliminary Approval Transcript, at 9 (noting two "most significant factors" as "how strong is the case, and how much money are the people getting for it.").

### b.    Rule 23(e)(2)(C)(ii): The Proposed Method for Distributing Relief Is Effective

As required by Rule 23(e)(3)(C)(ii), Plaintiffs and Class Counsel have also made substantial efforts to notify the Class about the proposed Settlement under Rule 23(e)(2)(C)(ii). In accordance with the Preliminary Approval Order, more than 23,000 Notices were mailed and 10,421 emails were sent to potential Class Members and nominees;[20] Summary Notice was transmitted over *PRNewswire*; and a Settlement website was established containing key documents and enabling Class members to submit claims electronically. *See* Chiango Decl., ¶¶4-9. As a result of the robust notice program, 4,471 claims (representing 43.8 million Aimmune shares) have been filed, **which reflects an exceptional 94% claim rate – a higher percentage than was tendered in favor of the Merger itself**. *Id.* at ¶12.

The Settlement proceeds will also be effectively distributed to the Class. Plaintiffs' proposed methods of distribution are set forth in greater detail in the parties' Stipulation. ECF 244-1, ¶¶ 5.1-5.9. By way of summary, the Proof of Claim and Release requests the information necessary to calculate a

---

[20] 945 Notices were returned as undeliverable. RG/2 was able to obtain an updated address for 643 Notices and re-sent them. Chiango Decl., ¶8.

claimant's claim amount pursuant to the Plan of Allocation. ECF 249-2, Ex. A-2. Claimants were required to submit the Proof of Claim and Release by the date specified in the Notice. *Id.*; ECF 249-2, Ex. A-1, pp. 1-2. Each Proof of Claim and Release is reviewed by the Claims Administrator, who has communicated and continues to communicate with Claimants regarding possible deficiencies and how to cure them. ECF 244-1, ¶ 5.3; ECF 249-1, Ex. A-1. The Claims Administrator continues to believe its initial $96,341 estimate for its fees and costs is reasonable and achievable, Chiango Decl., ¶13, and that figure is well below the $300,000 cap on such fees and costs set forth in the Stipulation of Settlement. ECF 244-1, ¶2.7.

The Plan of Allocation, discussed below, will govern how claims will be calculated and, ultimately, how funds will be distributed to claimants.[21] No distributions will be made to Authorized Claimants who would otherwise receive a distribution of less than $10.00, which is a standard threshold. *E.g.*, *Hefler v. Wells Fargo & Co.*, 2018 U.S. Dist. LEXIS 213045, at *31 (N.D. Cal. Dec. 17, 2018). The claims process here is identical to the processes commonly and effectively used with other class action settlements, and therefore weighs in favor of final approval. *See, e.g., Jiangchen v. Rentech, Inc.*, No. CV 17-1490-GW(FFMx), 2019 U.S. Dist. LEXIS 180474, at *23 (C.D. Cal. Oct. 10, 2019) (setting forth similar procedure and finding the "method proposed by the parties for processing Settlement Class Members' claims is typical for a securities…settlement").

c.    **Rule 23(e)(2)(C)(iii): Attorneys' Fees**

As discussed in Plaintiffs' Motion for Attorneys' Fees, Class Counsel seek an award of attorneys' fees of one third of the Settlement Amount and reimbursement of expenses of $325,088.72, plus accrued

---

[21]  Once Notice and Administration Expenses, Taxes, Tax Expenses, and Court-approved attorneys' fees and expenses have been paid from the Settlement Fund, the remaining sum will be distributed pursuant to the Plan of Allocation. *See* Stipulation, ECF 244-1, ¶5.2.  These distributions shall be repeated until the balance remaining in the Settlement Fund is *de minimis*.  *Id.* ¶ 5.7.  If there are any residual funds that are not feasible or economical to relocate, Plaintiffs shall donate such funds to the Bay Area Financial Education Foundation (in which no party or counsel has any interest). Stipulation, ¶5.7.  *See Hunt v. Bloom Entergy Corp.*, No. 19-cv-02935-HSG, 2024 U.S. Dist. LEXIS 82465, at *17 (N.D. Cal. May 6, 2024) (approving the foundation as a *cy pres* recipient because it "does work that aligns with the objectives of the securities laws underling this case and the class members' interest in protecting investors.").

1    interest. ECF 254. This fee request was fully disclosed in the Notice (ECF 248-1, Notice at §17); is

2    reasonable based upon the applicable Ninth Circuit factors (*see generally* ECF 254); is the same as in

3    other Section 14 Merger settlements (*id.*); has garnered no objections; and therefore likewise supports

4    final approval.

5             **d.    Rule 23(e)(2)(C)(iv): Other Agreements**

6             As Plaintiffs noted in their motion for preliminary approval, ECF 243 at 18, the parties entered

7    into a standard supplemental agreement with a customary opt-out threshold "blow-up provision,"

8    which provides that, if a certain threshold number of Class Members opt out of the Settlement,

9    Defendants shall have the option to terminate the Settlement (Stipulation ¶7.4), and which was not

10   publicly filed to avoid disclosing the specific threshold, but which Plaintiffs can submit *in camera* if

11   requested. While agreements of this sort are typical in class settlements, *see Medina v. NYC Harlem*

12   *Foods Inc.*, No. 21-CV-1321 (VSB), 2022 U.S. Dist. LEXIS 73263, at *19-20 (S.D.N.Y. Apr. 21,

13   2022), that agreement is now largely irrelevant, as claims have been made by shareholders holding

14   94% of eligible claims and there has been but one invalid request for exclusion – from a former

15   shareholder who was not even a member of the Class. There are no other side agreements, and this

16   factor again supports final approval.

17            **4.    Rule 23(e)(2)(D): The Settlement Treats Class Members Equitably**

18            Pursuant to Rule 23(e)(2)(D), the Settlement must "treat[] class members equitably relative to

19   each other." As noted above, the Plan of Allocation details how the Settlement proceeds will be distributed

20   among Authorized Claimants and provides a formula for calculating the recognized claim of each Class

21   Member based on each such person's holdings of Aimmune stock. The proposed Plan of Allocation is

22   fair, reasonable, and adequate because all eligible Class Members (including Plaintiffs) will be subject to

23   the same formula for distribution of the Settlement and each Authorized Claimant will receive his, her, or

24   its *pro rata* share of the distribution. As noted below, similar plans of allocation are routinely approved

25   as fair, reasonable, and adequate (*infra* §V). And, while Plaintiffs seek service awards of $5,000 each,

26   such awards do "not constitute inequitable treatment of class members." *Extreme Networks*, 2019 U.S.

27   Dist. LEXIS 121886, at *26 (citing *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009)).

28

1    Accordingly, this factor weighs in favor of final approval.

2        **C.    THE NINTH CIRCUIT FACTORS AND THE PROCEDURAL GUIDANCE ARE SATISFIED**

3            **1.    *Hanlon* Factors 1-4: the Strength of the Case vs. the Settlement**

4        *Hanlon* Factors 1-4 assess (1) the strength of plaintiffs' case; (2) the risk, expense, complexity,

5    and likely duration of further litigation; (3) the risk of maintaining class action status throughout the

6    trial; and (4) the amount offered in settlement. *Churchill*, 361 F.3d at 575. As outlined *supra* § III(B),

7    each of these factors strongly support final approval.

8            **2.    *Hanlon* Factor 5: Discovery Completed and Stage of the Proceedings**

9        The fifth *Hanlon* Factor assesses the extent of discovery completed and the stage of the

10    proceedings at which Settlement was achieved. *Churchill*, 361 F.3d at 575. As noted above, this factor

11    strongly supports approval as well. At the time the Settlement was reached, Plaintiffs and Class

12    Counsel had done virtually everything that can be done in a case before trial, and the Parties had a

13    thorough understanding of the arguments and evidence. Specifically, Plaintiffs and Class Counsel, over

14    more than four years: (i) conducted a detailed investigation into the claims asserted and drafted an

15    amended complaint; (ii) successfully opposed a 12(b)(6) motion to dismiss; (iii) successfully opposed

16    a Rule 12(c) motion for judgment on the pleadings and a motion for leave to seek interlocutory appeal;

17    (iv) won a motion for class certification; (v) extensively consulted with a valuation expert and obtained

18    an expert report on damages and loss causation; (vi) drafted and responded to written discovery

19    requests; (vii) obtained and analyzed over 313,000 pages of documents produced by Defendants and

20    third parties; (viii) conducted 19 depositions, both fact and expert; (ix) prepared and mailed surveys to

21    approximately 2,104 potential class members regarding the importance of the facts at issue in the case

22    to the reasonable investor; (x) fully briefed a partial motion for summary judgment and an opposition

23    to Defendants' motion for summary judgment; (xi) fully briefed a *Daubert* motion to limit the testimony

24    of Defendant's expert and an opposition to Defendants' motion to limit Co-Lead Plaintiffs' expert; and

25    (xii) participated in a fulsome mediation process with an experienced mediator. ECF 255 at ¶¶4-5;

26    accord ECF 253, Preliminary Approval Transcript, at 12 (noting "very thorough investigation of the

27    case by Plaintiff's counsel").

28

As a result, Plaintiffs and Class Counsel had a thorough understanding of the arguments, evidence and potential witnesses pertinent to trial and were well-positioned to evaluate the strengths and weaknesses of the claims and defenses at issue, as well as the fairness of the Settlement. *Id.* at ¶6; *accord Foster v. Adams & Associates, Inc.*, 2022 U.S. Dist. LEXIS 25071, at *16 (N.D. Cal. Feb. 11, 2022) (finding "[p]laintiffs were 'armed with sufficient information about the case' to broker a fair settlement" given "extensive fact and expert discovery," years of litigation, and three settlement conferences). Indeed, as noted, Plaintiffs pressed the case to the precipice: the parties did not agree to a settlement in principle until just *one day* before the dispositive motion hearing, and only then after a double-blind mediator's proposal. Accordingly, this factor too weighs in favor of final approval.

### 3.    *Hanlon* Factor 6: the Experience and Views of Class Counsel

The sixth *Hanlon* Factor assesses the experience and views of counsel. *Churchill*, 361 F.3d at 575. Courts in the Ninth Circuit accord weight to the recommendations and opinions of experienced counsel. *Id.* Here, Class Counsel have significant expertise in Section 14 merger litigation. Both M&A and KSF are recognized as preeminent securities firms, and both are listed in the Top 50 ISS Securities Class Action Services Report in recognition of the substantial settlements they have obtained. *See* ECF 255-2 and 255-3. Moreover, the attorneys at M&A are responsible for improving the standard of liability that shareholders need to prove under Section 14(e) in this Circuit. *See Varjabidien v. Emulex,* 888 F.3d 399 (9th Cir. 2018). As discussed, through their zealous advocacy, Class Counsel developed a thorough understanding of the facts, claims and Defendants' defenses. Based on their experience as accomplished merger litigators, coupled with their evaluation of the facts and law applicable to this case, they concluded that the Settlement – achieved with the support and guidance of a well-respected securities mediator – was a fair and reasonable compromise and in the best interests of the Class. Class Counsel's significant experience in securities litigation and their view that the Settlement is an excellent result for the Class in this case in particular strongly support final approval.

1
     **4.    _Hanlon_ Factor 7: No Other Case Affected or Government Participants**

2
       The seventh _Hanlon_ factor asks whether any other cases will be affected by a proposed

3
settlement or whether there is a relevant governmental participant. _Churchill_, 361 F.3d at 575. The

4
Parties are aware of no other cases that will be affected by the Settlement; there are no governmental

5
participants involved in the Merger or the Action; and this factor thus supports final approval.

6
     **5.    _Hanlon_ Factor 8 and Final Approval Procedural Guidance 1: the Positive Reaction of Class Members to the Settlement**

7
       Finally, the eighth _Hanlon_ Factor assesses the reaction of the class to the proposed settlement.

8
_Churchill_, 361 F.3d at 575. The "absence of a large number of objections to a proposed class action

9
raises a strong presumption that the terms of a proposed class settlement action are favorable to the class

10
members." _Nat'l Rural Telecomms. Coop. v. DIRECTTV, Inc._, 221 F.R.D. 523, 529 (C.D. Cal. 2004).

11
The deadline to object to the Settlement was June 6, 2025. **No objections were received, and no Class**

12
**Members have opted out.** Chiango Decl., ¶¶10-11.[22] By contrast, as noted, **Class Members made**

13
**claims that represent an exceptional 94% percent claim rate – such that more Class Members**

14
**supported the Settlement than supported the merger.** These metrics again indicate a strong

15
settlement, and the Class's positive reaction to the Settlement strongly supports final approval.

16
**IV.    THE NOTICE SATISFIES DUE PROCESS**

17
       As the Court found in granting preliminary approval, the notice program here satisfies Rule 23,

18
the PSLRA, this Court's guidelines, and the Due Process Clause by fairly apprising the Class Members

19
of their rights with respect to the Settlement, and is the best notice practicable under the circumstances.

20
ECF No. 251 at ¶7. Over 23,000 Notices were sent to potential Class members, who, as noted, have

21
overwhelmingly responded positively to the Settlement. _See_ Chiango Decl. ¶¶4-7, 12.

22
**V.    THE PLAN OF ALLOCATION WARRANTS APPROVAL**

23
       Plaintiffs also seek approval for the Plan of Allocation as set forth in the Notice disseminated to

24
the Settlement Class. ECF No. 248-1, Ex. A-1, at p. 10-11. Like the standard for approval of a

25

26

27

---

[22] As noted, RG/2 received one invalid request for exclusion from a former shareholder who was not an actual Class Member. Chiango Decl., ¶10 & Ex. C.

28

settlement, the standard for approval of a plan of allocation is whether the plan is fair, reasonable, and adequate. *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992); *In re Omnivision Techs.*, 559 F. Supp. 2d at 1045. Under this standard, it is reasonable to allocate the settlement funds to class members based on the extent of their injuries. *Id.* In *Omnivision Techs.*, the Court approved a plan of allocation based on disbursement of the net settlement fund on a *pro rata* share basis, so each class member would receive a portion of the net settlement fund proportional to the number of shares they owned. *Id.* at 1045-46.

Here, as in *Omnivision Techs.*, the Plan of Allocation provides that each Authorized Claimant that submits a valid, timely Proof of Claim will receive distribution from the Net Settlement Fund on a *pro rata* basis. ECF 248-2, at p. 2. The Plan of Allocation is similar to plans approved in similar Section 14 merger cases. *See Campbell v. Transgenomic*, Inc., 2020 U.S. Dist. LEXIS 97063 (D. Neb. June 3, 2020); *Duncan v. Joy Global Inc. et al*, Case No. 2:16-cv-01229, Dkt. No. 77 (E.D. Wis. 2016); *In re Hot Topic, Inc. Sec. Litig.*, No. 2:13-cv-02939, Dkt. No. 86, 103 (C.D. Cal. 2015). In sum, the Plan of Allocation is fair, reasonable, and adequate, supported by authority in other Section 14 settlements, and therefore merits approval. The Proposed Final Judgment and Order of Dismissal with Prejudice provides for approval of the Plan of Allocation at paragraph 17.

## VI.    THERE REMAINS NO DIFFERENCES BETWEEN THE CERTIFIED CLASS AND THE SETTLEMENT CLASS

Finally, the "Class" is defined in paragraph 1.6 of the Stipulation identically to how the "Class" was defined in the Order Granting Co-Lead Plaintiffs' Motion for Class Certification (ECF 143). Since then, no material facts regarding any of the factors for class certification have changed, and there is no "reason to reconsider [the] prior certification order." *Koeppen v. Carvana, LLC*, No. 21-cv-01951-TSH, 2024 U.S. Dist. LEXIS 150626, at *11-12 (N.D. Cal. Aug. 22, 2024).

## VII.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court finally approve the Settlement and enter the Proposed Final Judgment and Order of Dismissal With Prejudice filed herewith.

Dated: June 27, 2025

Respectfully submitted,

David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (310) 446-6652
dbower@monteverdelaw.com

/s/ Juan E. Monteverde
Juan E. Monteverde (NY Reg. No 4467882)
**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde (*pro hac vice*)
Miles D. Schreiner (*pro hac vice*)
Jonathan T. Lerner (*pro hac vice*)
350 Fifth Avenue, Suite 4740
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com
jlerner@monteverdelaw.com

**KAHN SWICK & FOTI, LLC**
Michael Palestina (*pro hac vice*)
Brian Mears
Gina Palermo
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
michael.palestina@ksfcounsel.com
brian.mears@ksfcounsel.com
gina.palermo@ksfcounsel.com

*Counsel for Co-Lead Plaintiffs and Class Counsel*

*Counsel for Co-Lead Plaintiffs and Class Counsel*

24